**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ENGATE, INC.,                      )
                                   )
        Plaintiff,                 )
                                   )        Case No. 01 C 6204
                                   )
    v.                             )        Judge Matthew F. Kennelly
                                   )
ESQUIRE DEPOSITION SERVICES, LLC ) )        Magistrate Judge Arlander Keys
and ATKINSON-BAKER, INC.           )
                                   )
        Defendants.                )

**FILED**

APR 2 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED

APR 2 3 2004

---

## BRIEF OF THE NATIONAL COURT REPORTERS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF THE MOTIONS FILED BY ESQUIRE DEPOSITION SERVICES, LLC AND ATKINSON-BAKER, INC. TO ALTER AND AMEND THE JUDGMENT

The National Court Reporters Association ("NCRA"), by its attorneys, respectfully

submits this brief as *Amicus Curiae* in support of the motions to alter and amend the judgment

filed by Defendants Esquire Deposition Services, LLC ("Esquire") and Atkinson-Baker, Inc.

("Atkinson").

### STATEMENT OF INTEREST

NCRA is the national professional society for the court reporting profession and has been

in existence for more than 100 years. Its membership is composed of court reporters, including

realtime reporters from across the country. NCRA is committed to being the leader in advancing

the profession of those who capture and integrate the spoken word into a comprehensive and

accurate information base for the benefit of the public and private sectors. NCRA accomplishes

this through developing ethical standards; providing testing, certification and educational

231

opportunities; performing research and analysis; and disseminating information. NCRA has approximately 25,000 members nationally.

This case has ramifications far beyond the functioning and integrity of the judicial system, where court reporters create the official record of court proceedings and pretrial depositions. NCRA members also provide the equivalent of realtime reporting services as captioners for television and Internet broadcasts, and provide so-called Communications Access Realtime Translation ("CART") services to ensure that 28 million Americans who are deaf and hard-of-hearing may fully participate in education, civic, business and other settings. Engate has threatened NCRA's members who perform any realtime reporting services in all of these settings with patent infringement lawsuits unless they acknowledge the validity of Engate's patents and enter into an agreement with Engate or its "exclusive licensee," LiveNote. The terms of the agreements that Engate has proposed (directly to NCRA members, or through the sublicensing agreement that Engate has reached with LiveNote), involve a significant financial burden on the individual, independent contractors and (primarily) small firms that provide realtime services.

Some NCRA members have agreed to pay licensing fees even though they believe that there is prior art that demonstrates the invalidity of Engate's patents that are the subject of the summary judgment motion. Other NCRA members have simply declined to continue to provide realtime services. Such actions have hurt not just NCRA's members, but also lawyers, litigants, and other consumers/users of these services, such as the deaf and hard-of-hearing, who must ultimately bear the burden of the licensing fee or who may simply not be able to find a reporter that is willing to risk providing such realtime services.

## ARGUMENT

NCRA supports the motions for reconsideration filed by the two remaining defendants and strongly encourages the Court to consider the validity of the patents and the outstanding unfair competition claim. Engate's demands regarding realtime services not only threaten NCRA's members that provide judicial reporting, captioning and CART services, but also adversely impact the ultimate consumers/users and the general public.

It is important to note that this Court's rulings on direct infringement and inducement/indirect infringement are not binding on Engate in its dealings with other firms and individual reporters. Moreover, Engate does not even consider itself bound by the concessions that it has made in this proceeding regarding the limited number of patent claims that it is asserting. Finally, Engate and its licensee threaten realtime services even if there is no attempt to use the patented interactive realtime features.

Although the Court's Order and Judgment relieve the two remaining defendants from Engate's threats, it unfortunately does nothing to protect the clients of the two remaining defendants, all of the other court reporting firms, individual reporters, lawyers, television and webcast viewers, students and others who remain at risk from Engate's demands. The only way to provide relief to the entire community of realtime providers and users is if the Court agrees to determine the validity of the patents that are at issue. This question has been almost fully briefed by the parties and it is NCRA's understanding that substantial prior art has been presented that should lead to the invalidation of Engate's patent claims. No other firms or reporters will likely have the resources to challenge the validity of the patents that are the subject of the summary judgment motion or to pursue unfair competition claims, such as Esquire's allegation under California Business and Professions Code section 17200 et seq. to the effect that Engate has

unlawfully sued Esquire on patents that it knows Esquire does not and can not infringe, thereby

acting in bad faith solely to increase Esquire's litigation costs and otherwise harm Esquire.

NCRA would like to take this opportunity to bring certain information to the attention of

the Court that explains and validates NCRA's position in support of the motions for

reconsideration. Last fall, NCRA's counsel sent a letter dated September 17, 2003 (Exhibit A) to

Engate's counsel, seeking information about the number of patent claims that Engate was still

asserting against NCRA's members. By letter dated September 30, 2003 (Exhibit B), Engate's

counsel responded that Engate's decision to "narrow" the number of claims in this litigation was

"not relevant" to demands against NCRA's members, stating: "In fact, it is Engate's intent to

enforce all of its claims contained in its patent portfolio against infringement." This position

obviously is intended to intimidate and make virtually impossible any effort by a small firm or

independent court reporter to defend against Engate's demands, since Engate originally asserted

hundreds of claims based on its patents.[1]

Moreover, even though this Court clearly stated in previous opinions and in its latest

Order that Engate's patents do not cover the provision of realtime services, Engate is threatening

firms for doing nothing more than providing realtime services, thereby improperly expanding the

scope of its patents. Earlier this year, Engate sent a letter dated January 29, 2004 (Exhibit C) to

court reporting firms throughout the country who apparently *did nothing more than advertise*

*that they provide realtime services* in NCRA's professional journal, stating:

> Information appearing in the Journal of Court Reporting suggests that your agency
> is offering real time reporting services. As such, it is highly likely that your
> agency is directly or indirectly infringing one or more claims of the Engate
> Patents.

---

[1] Indeed, Engate took such a tactic in this litigation, as it originally asserted hundreds of claims against Esquire and
Atkinson-Baker. Engate only dropped down to the remaining 26 claims after it was unwilling or unable to explain
how the defendants allegedly infringed the hundreds of claims originally asserted.

The letter also lists all 16 patents that presumably include the hundreds of patent claims that Engate originally asserted in this litigation. After providing information about its licensee, LiveNote, the letter concludes by stating: "Please beware that Engate will enforce its patents against unlicensed use." The court reporting community is acutely aware of this litigation and the enormous defense costs that the defendants have incurred to protect themselves, so Engate's threats are not lightly taken.

Court reporting firms and independent court reporters naturally interpret Engate's demands and threats to encompass all realtime services since Engate confuses and blurs the distinction between the interactive realtime features for which it has received patents, and realtime services in general, on which it has no patent. This distinction is also blurred by Engate's licensee, LiveNote, whose "token" sublicensing system broadly applies to the mere creation and delivery of a realtime feed, regardless of whether Engate's patented features are used.

Last fall, shortly after Engate and LiveNote announced this new "token" system[2], NCRA contacted LiveNote on behalf of its members seeking answers to a number of critical questions, starting with how LiveNote intended to distinguish between realtime services in general and the interactive realtime features that are the subject of this litigation. LiveNote merely took the same position as Engate, namely, that it need not distinguish between Engate's patented interactive realtime features and realtime connections in general. Instead, LiveNote imposes a license fee on all realtime uses of its product. *See* Question and Answer No. 1 in LiveNote's letter dated

---

[2] Engate and LiveNote entered into a business arrangement in which LiveNote is Engate's "exclusive licensee" of Engate's patented technology. As a result, LiveNote has created a system in which a $35 license fee must be paid to

September 29, 2003 (Exhibit D)(where LiveNote attempts to justify its improper extension of Engate's patents to all realtime by arguing that the "fact that the license fee is collected during all instances of realtime enabled LiveNote to negotiate a much reduced license fee").

NCRA brings this information to the attention of the Court to demonstrate Engate's fundamental misuse of the patent monopoly and the extent to which Engate and its licensee are unfairly threatening NCRA's members and those who use and rely on their realtime services. Engate is unwilling to narrow the number of claims at issue in its demand letters to other firms and reporters, and both Engate and its licensee demand a fee merely to receive a realtime feed, even if their patented technology is never used.

As this Court noted in its Orders of September 10, 2003 and March 26, 2004, the patents at issue in this litigation do not cover realtime court reporting generally, and Engate has no right to prevent the use of realtime reporting in and of itself. However, Engate's demands and threats, and the "token" system developed by its licensee, LiveNote, fail to make this distinction and broadly threaten court reporting, broadcast captioning, Internet webcasting, and CART service providers *who have no interest or intent in providing the interactive realtime features that are either at issue in this litigation or embraced by Engate's patents.* Engate's demands and threats are made against all providers of realtime services and LiveNote's "token" system requires reporters to pay a fee on **all** realtime sessions or face litigation.

The only way to bring relief for the vast majority of firms and independent reporters who are not parties to this litigation is for the court to decide the validity of the patents. This

acquire a "token" which permits a single realtime connection to be made, regardless of whether Engate's patented functions are utilized or intended to be utilized.

issue is nearly fully briefed and ***nothing further is due from Engate***. Based on the tremendous amount of prior art that has been uncovered and provided to the Court, there appears to be clear and convincing evidence that interactive realtime was already in place and functioning in the federal and state courts well before Engate filed its patents.[3]

The Court's failure to rule on the validity of the patent claims will allow the uncertainty, demands and threats to persist, to the damage of the reporting profession and the general public, even though the patents at issue appear to be invalid. Realtime is critical not just in judicial proceedings. It forms the foundation of communication access in both the live-event, broadcast and Internet captioning settings, and it is absolutely essential to meeting the needs of 28 million deaf and hard-of-hearing Americans. Engate's patent claims have had a chilling effect on the application of realtime and made it even more difficult for these Americans to receive the services they need to function effectively in American society, whether in a judicial, civic, classroom or other environment.

Court reporting firms are typically small businesses. These small firms and individual court reporters simply lack the resources to defend themselves against Engate's demands and threats. Rather than bear the risk to their livelihoods, many providers are paying fees that they believe are being unjustly and unlawfully levied on every realtime session (even when no interactive features are utilized or intended). Others are simply refusing to provide realtime services at all, to the detriment of the customers who rely upon these services for the efficient and

---

[3] Although only a small number of Engate's hundreds of claims are at issue in this litigation and subject to the summary judgment motion, a finding that those claims are invalid will make it very difficult for Engate to continue to threaten and harass NCRA's members. Based on the claims Engate chose to proceed with in this litigation, it appears that Engate chose those claims that were most likely to be infringed (assuming, *arguendo*, that any claims are infringed). If those claims are declared invalid, Engate's litigation threats will ring hollow.

effective operation of our judicial systems, or for broader communication access for the public good. Uncertainty over the validity of the patents has cast a pall over the provision of realtime services to the detriment of NCRA's members and the general public. Given the aggressive nature in which Engate and its licensee are seeking to enforce Engate's patent claims, it also makes sense to give Esquire the opportunity to prove its unfair competition claim. Decisions by this Court on the unfair competition claim as well as on the validity of the patent claims are the only way to provide certainty and relief to court reporters and the general public. Unless this Court hears these claims, no other court reporting firms or independent reporters are likely ever to have the resources to challenge or defend against Engate's claims (even though prior art strongly suggests that Engate's patent claims that are the subject of the summary judgment motion are invalid), or the manner in which Engate has attempted to enforce its patent claims.

For the reasons described above, NCRA respectfully requests the Court to alter and amend the judgment entered on March 29, 2004, and allow the two remaining defendants to proceed with their declaratory judgment counterclaims for patent invalidity and the unfair competition counterclaim.

Respectfully submitted,

National Court Reporters Association

By: _____
    One of Its Attorneys

John W. Guarisco, Esq. (#6229369)
NEAL, GERBER & EISENBERG LLP
Two North La Salle Street
Suite 2200
Chicago, IL 60602
Tel: (312) 269-8000
Fax: (312) 269-1747

8

**Of Counsel**
Jeffrey P. Altman, Esq.
McKenna Long & Aldridge LLP
1900 K Street, NW, Suite 100
Washington, DC 20006
Tel: (202) 496-7520
Fax: (703) 496-7756

Atlanta

Denver

Los Angeles

Philadelphia

MATTHEW T. BAILEY
(202) 496-7643

# McKenna Long
# & Aldridge LLP
### Attorneys at Law

1900 K Street, NW • Washington, DC 20006
202.496.7500 • Fax: 202.496.7756
www.mckennalong.com

San Diego

San Francisco

Washington, DC

Brussels

EMAIL ADDRESS
mbailey@mckennalong.com

September 17, 2003

By U.S. Certified Mail/
Return Receipt Requested

Rolf O. Stadheim, Esq.
Stadheim & Grear
400 North Michigan Avenue
22nd Floor
Chicago, IL 60611-4102

> Re:  **Engate Inc. v. Esquire Deposition Services LLC, et al., Case No. 01 C 6204**
>      **Our Ref: 17122.0026**

Dear Mr. Stadheim:

We serve as General Counsel to the National Court Reporters Association and also represent a number of individual court reporting firms that have received demand letters concerning the patents at issue in the above-referenced litigation. We understand that you represent the plaintiff, Engate Inc., in the above-referenced litigation.

It is our understanding that you sent letters to numerous court reporting firms on behalf of Engate alleging patent infringement and demanding that they enter into license agreements with Engate in order to continue providing interactive real-time reporting services. These demand letters asserted a portfolio of patents that include over 300 separate claims across sixteen patents. However, during the course of the above-referenced litigation, you apparently have withdrawn your assertion of all but a small subset of claims in only some of the patents.

It is important for us to know what claims you are currently asserting so that we can evaluate these claims on behalf of our clients. Please confirm for us which are the only claims you are asserting against those who have received demand letters. Please also confirm whether these same claims are included in the license agreement that recently was announced by

**Exhibit A**

DC-129092-v1-engate_letter211.DOC
9/17/03 2:43 PM

Rolf O. Stadheim
September 17, 2003
Page 2


LiveNote. We are also, of course, interested in any other attributes of the license by LiveNote that you will share with us that would affect our clients. If there are any claims at issue other than those being asserted in the above-referenced litigation, please explain why they are being asserted against our clients who received demand letters, but not against the defendants in the above-referenced litigation.

Very truly yours,

Matthew T. Bailey

MJB:GGB



**THE LAW OFFICES OF**
**STADHEIM & GREAR LTD.**

Wrigley Building Tower
400 North Michigan Avenue
Chicago, Illinois 60611-4102

312 755-4400
Fax 312-755-4408

September 30, 2003

**VIA FACSIMILE (202) 496-7756**

Matthew T. Bailey, Esq.
McKENNA, LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, D.C. 20006

Re:     *Engate, Inc. v. Esquire Deposition Services LLC*, Case No. 01 C 6204
          (N.D. Ill.)

Dear Mr. Bailey:

I am writing in response to your September 17, 2003 letter to Rolf Stadheim. You are correct that, in the afore-referenced litigation, Engate voluntarily narrowed the number of asserted claims from its patent portfolio to 26. The reason for doing so was to streamline that particular litigation, rather than a belief that the remaining claims were not infringed, or due to any compulsion by the Court. As such, Engate's decision to narrow the number of claims is not relevant to the claims it may assert against the NCRA's membership. In fact, it is Engate's intent to enforce all of its claims contained in its patent portfolio against infringement.

The terms of the license agreement between Engate and LiveNote are confidential, and I am not at liberty to disclose those terms to you. I can, however, refer you to LiveNote for the terms under which it will sell time-limited sub-licenses under the Engate patents to the NCRA's membership.

If you have any questions concerning any of the foregoing, please do not hesitate to contact me.

Very truly yours,

George C. Summerfield

cc:     Christopher Winslade, Esq. (via facsimile)
          Joseph A. Grear, Esq.

**Exhibit B**



THE LAW OFFICES OF
STADHEIM & GREAR LTD

Wrigley Building Tower
400 North Michigan Avenue
Chicago, Illinois 60611-4102

312-755-4400
Fax: 312-755-4408

**VIA FIRST CLASS MAIL**

January 29, 2004

To Whom It May Concern:

We represent Engate, Inc. in the licensing and enforcement of its patents directed to real time reporting feature functionality. The portfolio includes 16 issued U.S. patents and several pending applications. A list of the issued patents is attached hereto as Exhibit A. Information appearing in the Journal of Court reporting suggests that your agency is offering real time reporting services. As such, it is highly likely that your agency is directly or indirectly infringing one or more claims of the Engate Patents.

As you may be aware, LiveNote, Inc. has taken a license under the Engate Patents. In its capacity as licensee under the Engate Patents, LiveNote has created a program pursuant to which court reporting agencies and attorneys can purchase time-limited sub-licenses to use the Engate patented technology. Details regarding LiveNote's sub licensing program may be obtained on LiveNote's web site (www.livenote.com), or by calling 1 (800) LIVENOTE.

Please beware that Engate will enforce its patents against unlicensed use. Should you have any questions please call me.

Very truly yours,

George C. Summerfield

**Exhibit C**

## EXHIBIT A

6,282,510   Audio and video transcription system for manipulating real-time testimony

6,055,531   Down-line transcription system having context sensitive searching capability

6,026,395   Down-line transcription system having real-time generation of transcript and
searching thereof

6,023,675   Audio and video transcription system for manipulating real-time testimony

5,970,141   Down-line transcription system for manipulating real-time testimony

5,980,194   Down-line transcription system having real-time generation of transcript and
searching thereof

5,949,952   Audio and video transcription system for manipulating real-time testimony

5,940,800   Attorney terminal having outline preparation capabilities for managing trial
proceedings

5,926,787   Computer-aided transcription system using pronounceable substitute text
with a common cross-reference library

5,884,256   Networked stenographic system with real-time speech to text conversion for
down-line display and annotation

5,878,186   Audio and video transcription system for manipulating real-time testimony

5,815,639   Computer-aided transcription system using pronounceable substitute text
with a common cross-reference library

5,815,392   Attorney terminal having outline preparation capabilities for managing trial
proceedings

5,740,245   Down-line transcription system for manipulating real-time testimony

5,444,615   Attorney terminal having outline preparation capabilities for managing trial
proceeding

5,369,704   Down-line transcription system for manipulating real-time testimony



San Francisco    London    Melbourne

29 September 2003

Mark J. Golden, CAE
Executive Director & Chief Executive Officer LiveNote
National Court Reporters Association
8224 Old Courthouse Road
Vienna, Virginia
22181-3808

Dear Mark

We appreciate the opportunity to reply to the concerns raised by members of the NCRA. Clearly they address serious issues and we would therefore appreciate if the answers are made available in their entirety and within context to ensure that accurate information is provided to all members.

The answers are intended to provide clarity and a greater understanding of the manner in which we chose to resolve the Engate patents issue. We hope that in time, the benefits of this solution over protracted litigation will become even clearer and that interactive realtime will continue to grow and prosper. This is essential as realtime continues to evolve as the defining difference between the functions performed by court reporters and technological alternatives. Our answers are provided in the sections below:

> 1. Engate's patents claim rights to certain, specific interactive realtime features, **not to the** simple creation and delivery of a realtime feed. How will the token system differentiate between those realtime sessions that (allegedly) infringe upon the patented features and those outside the scope of the patents?

**Answer:**

The token system does not distinguish between the different interactive realtime functions that attorneys choose to use at a deposition or trial. Creating a differentiation in the product would have been impractical and would almost certainly have increased the cost to reporters and their clients. The fact that the license fee is collected during all instances of realtime enabled LiveNote to negotiate a much reduced license fee.

We believe that the simple creation and delivery of a realtime feed will not address users' needs. It is LiveNote's experience that attorneys greatly benefit from the enhanced functionality of interactive realtime. Currently, we are not aware of any non-interactive, "view-only" realtime software that is widely used by attorneys anywhere in the U.S.

> 2. Engate's has indicated that it will not waive its right to aggressively pursue claims against individual reporters and firms if it feels this token payment system is not being fully complied with. What assurance will reporters/firms who choose to use the "safe harbor" and make token payments have that Engate will not make audit demands or take other action to satisfy itself that the all of the reporter/firm's interactive realtime sessions are being accounted for?

LiveNote, Inc. 795 Folsom Street, First Floor, San Francisco, CA 94107
Tel 415-848-3027 – Fax 415-848-2301 – www.livenote.com

**Exhibit D**

**Answer:**

Given the vast number of realtime court reporters and agencies in the industry, it stands to reason that those demonstrating compliance will be the least likely targets of aggressive action by Engate. That having been said, there is no way to guarantee that Engate will never request proof of 'total' compliance from a reporter or agency.

Any reporter that maintains a policy of writing only into Engate-compliant software and that purchases realtime licenses for all non-compliant connections would have nothing to fear from an Engate demand letter. Such a reporter could easily provide documentation supporting its compliance with the licensing program and hence, the patents.

Short of a judicial finding that Engate's patents are invalid or unenforceable, LiveNote cannot envision any stronger measure of protection that could be provided to the industry.

---

3. What restrictions, conditions or limitations (if any) will govern future increases in the cost of tokens?

**Answer:**

LiveNote does not presently anticipate that the token fee will increase above $35. Further, Engate cannot prescribe price changes to LiveNote, per the terms of our license agreement. Of course, no business can ever guarantee that the price of a service or product will never change over time, as inflation, taxes and other economic forces can be unpredictable.

---

4. Will adequate systems, personnel and other resources be in place as of September 1 to assure that the purchase, registration and use of tokens will be a simple and undisruptive transaction?

**Answer:**

LiveNote launched its registration website successfully on September 1, 2003 along with a dedicated support capability. Court reporters or agencies can obtain realtime licenses, support and information at www.livenote.com or directly from support technicians at 1-800-LIVENOTE. Reporters can purchase licenses up to five business days after a realtime session, so there are no support issues onsite at a deposition or trial.

The token system (required by all updated LiveNote software from January 1, 2004 onwards) was developed with ease of use, reliability and security as overriding design principles. The system promises to be undisruptive, especially where court reporters have familiarized themselves with the token system. Further, if an attorney comes to deposition or trial with a pre-loaded token, there are no support issues onsite.

---

5. Will adequate systems, customer service, technical service and other resources be in place as of September 1 to resolve technical problems, confusion and uncertainty that will certainly arise at deposition sites among court reporting clients who are unaware of this new fee arrangement?

*LiveNote, Inc*
*Replies to the NCRA*

**Answer:**

As stated above, adequate systems, customer care and technical support infrastructure are already in place to deal with potential realtime licensing issues. We are also pro-actively providing training and support to law firms and court reporters to ensure as smooth a transition as possible to the token system, which will automatically enable in LiveNote Version 8.3 on January 1, 2004.

---

6. What is the reporter's obligation if one or more attorney at a deposition refuses to participate in the token system or pay the fee?

**Answer:**

Where an attorney uses token software, the attorney is not able to receive a realtime feed unless a token has been loaded. It is therefore the attorney's decision whether to receive an Engate compliant feed or not to receive a feed at all.

Where an attorney uses non-token software and refuses to pay for a realtime license, we encourage the reporter to inform the attorney of the risks of potential infringement and that the license is protecting all parties involved in the deposition. The reporter can provide the attorney with a fact sheet already produced by LiveNote for this purpose.

In the event that the attorney still refuses to pay for a realtime license, the reporter is free to decide whether to (1) potentially infringe Engate's patents by providing an unlicensed connection or (2) provide a connection and purchase a realtime license on their own behalf.

LiveNote has seen little evidence to suggest that attorneys will refuse paying a nominal license fee only to risk potential patent infringement. Some law firms have already expressed concern about the consequences of potential infringement and have even begun requesting proof of Engate compliance from their court reporters. Regardless, reporters are under no "obligation" should an attorney refuse to pay for a realtime license, they simply have a choice.

---

7. Will Engate, in written and enforceable form, indemnify or otherwise assure reporters who elect to participate in the token system that they will not face threats of future claims of infringement of the Engate portfolio of patents?

**Answer:**

Engate is providing written confirmation that they will not initiate an offensive pursuit of prior or current infringement claims to interested court reporters and agencies who timely commence and maintain compliance. These written and enforceable confirmations are available from LiveNote for all reporters and agencies that undertake in writing not to infringe in the future.

Furthermore, numerous law firms have requested a list of reporting agencies that are committed to supporting the updated token software. These law firms are concerned about the potential risk of infringement as well as the disruption of working with reporters and agencies that are not able to support tokens adequately. For this purpose, LiveNote will maintain a list of compliant agencies on its website. A number of reporting agencies have already committed to compliance in writing and will be included in the initial list.

*LiveNote, Inc*
*Replies to the NCRA*

> 8. Once the automated token payment system has been integrated into its product, will LiveNote indemnify users of its software against any future claims of patent infringement, by Engate or any other party?

**Answer:**

For LiveNote to "indemnify" users would merely mean that if a user were sued, LiveNote would take on the lawsuit and pay any damages. LiveNote's solution goes further – it provides immunity against any action by Engate. Engate has no legal basis to initiate any action against a court reporter or attorney over a licensed realtime connection.

Reporters connecting into LiveNote 8.3 (or other "token software"), and the attorneys using it, are in full compliance with Engate's entire portfolio of patents, both present and future. Connections into non-token software can still be made Engate-compliant if the reporter purchases a realtime license via our website up to 5 business days after the realtime session is over.

LiveNote's standard end user licensing terms, like those of most software providers, do not include indemnification. Regardless, LiveNote needs to vigilantly guard our users against any viable IP threat or risk jeopardizing our business interests. We believe the escalation of the Engate matter necessitated our providing a legal solution for both our end users and service providers.

> 9. LiveNote has indicated that token payments will not be required from court personnel, but will be required from attorney's receiving realtime in the courtroom. What steps are being taken and at what time will Federal and state court rules be modified to permit this new charge to be collected in the courtroom setting?

**Answer:**

No changes in court rules are currently envisaged, as there is no obligation on court personnel to furnish attorneys with tokens. Attending attorneys can obtain tokens directly from LiveNote and thus arrive in court ready to receive an Engate-compliant realtime connection. However, over time, LiveNote is confident that court reporters in certain courts will commence reselling tokens to attending attorneys. This will provide attorneys with an alternate source of tokens and potentially, court reporters with an incremental source of revenue.

We appreciate the diverse needs in the state and federal courts and the different local rules that apply. We are also very aware of the benefits of realtime to official court reporters and court staff. To this end, we will be working closely with court administrators and official court reporter associations in establishing realtime solutions within the courts.

Bill Weber, past NCRA President, has joined LiveNote as Court Liaison and will be responsible for working with courts across the U.S. on implementing the token system and increasing the use of realtime.

> 10. LiveNote has indicated that realtime captioning, CART and courtroom personnel will not be required to make token payments. Will LiveNote and Engate, in written and enforceable form, confirm that they will not require licensing fees from these persons?

*LiveNote, Inc*
*Replies to the NCRA*

**Answer:**

In most cases, the provision of CART and captioning services excludes interactive realtime functions and hence, it is questionable whether the patents apply. However, where token software is used to provide such services, tokens may be obtained from LiveNote at no cost. LiveNote has stated publicly that it is not charging for tokens being provided for CART and captioning, as well as for court personnel utilizing the tokens in court.

---

11. LiveNote has indicated the price of tokens could vary depending upon such factors as the quantity purchased. While such price differentials might be logical, how will the reporter be able to square such variations with their ethical obligation to be "fair and impartial toward each participant in a proceeding", including offering comparable services under the same terms and conditions to all parties?

**Answer:**

If a reporting company purchases a large number of tokens in advance for resale to attorneys, they may indeed enjoy a volume discount on those tokens. However, when the reporter resells those tokens to the attorneys at a deposition or trial, there is no reason they shouldn't charge a consistent price to all.

If an attorney or law firm purchases tokens directly from LiveNote and pre-loads their software, there is no need for the court reporter to charge the attorney for any tokens or licenses.

---

12. Under what terms and conditions will the automated token collection technology that LiveNote is developing be made available to other realtime litigation support software?

**Answer:**

The token technology in LiveNote Version 8.3 will be made available on reasonable terms to other realtime software providers for integration into their products, if desired.

The details of the terms and conditions that LiveNote has offered or will offer to other realtime software providers must, by nature, be part of the confidential discussions between our companies. However, see the answer to question #13 for more information on how this will affect users of other realtime software.

---

13. Will LiveNote hold users of its own software to the same terms, conditions and pricing for the token system that it requires of users of other realtime litigation software?

**Answer:**

When other realtime software providers adopt the token system, their users will be able to connect to realtime sessions using the same tokens (and hence, pay the same price) as LiveNote users. Their users will receive the same protections as LiveNote users – full immunity from Engate for their realtime use.

Though LiveNote cannot control the price that agencies and reporters charge attorneys for tokens, we don't see any reason that a non-LiveNote user should ever be asked to pay more for a token than a LiveNote user.

*LiveNote, Inc*
*Replies to the NCRA*

> **14. How and when will LiveNote create awareness and understanding among the end users of its software of this new charge?**

**Answer:**

LiveNote has already communicated the details of the Engate situation and the upcoming token system to its user base. We have discussed the matter in depth with many of our premier clients as part of an aggressive phone campaign, and are covering it in our many onsite presentations at law firms.

These efforts have made us confident that our user base will diligently update to LiveNote Version 8.3 once it becomes available in October. By upgrading, law firms greatly minimize the risks of future litigation by Engate and benefit from the enhanced functionality contained in the latest version of our software. Some firms anticipate pre-loading their litigators' software with tokens, while others prefer relying on court reporters to provide tokens onsite as needed. As mentioned above, numerous law firms have already asked us to provide a list of Engate-compliant reporting agencies they can count on for token support.

> **15. What happens to this proposal if the Chicago litigation is ultimately resolved in favor of the defendants?**

**Answer:**

Unfortunately, a resolution of the Engate v. Esquire matter would likely do little to resolve this matter for the rest of the industry.

For example, even if the court were to find in the months ahead that Engate has not proven that Esquire and the other remaining defendants have infringed their patents in any way, that would still not prevent Engate from filing more lawsuits against others and attempting to prove that *they* have infringed.

Further, the Esquire litigation has established that agencies, for the most part, are not accountable for the infringing activities of their independent reporters, even when the agencies refer realtime jobs to them. Following that precedent, Engate would have little choice but to file their lawsuits directly against independent reporters.

Unlike Esquire, most reporters are not insured for patent infringement and cannot afford costly litigation. They would be forced to settle and begin paying exorbitant royalties or stop offering realtime services altogether. We have already seen this happen in response to demand letters sent by Engate over the past year.

An alternate scenario is even more disturbing: imagine if LiveNote had not secured a license and Esquire settled its litigation with Engate (as well over 90% of US litigants do) on a favorable basis. In this scenario, Esquire could provide Engate-compliant realtime connections at rates far below what other agencies would have to pay for Engate licenses. Not only would no protection be offered for the rest of the industry, but Esquire would also be afforded a huge advantage in recruiting realtime reporters fearful of litigation. In contrast, LiveNote's plan provides a level playing field for all reporters and agencies, regardless of their size or financial resources.

Only a finding that Engate's patents are invalid or unenforceable as a matter of law would eliminate the threat against the rest of the industry, including the attorneys who

*LiveNote, Inc*
*Replies to the NCRA*

receive the realtime transcript. Should this come to pass, LiveNote would be at liberty to terminate its license with Engate.

At this time it appears extremely unlikely that the Engate v. Esquire litigation will ever yield such a ruling. LiveNote would welcome any action that would accomplish this.

In summary, the token system was introduced as a large number of agencies supporting our product became concerned over the serious risks of patent infringement. This had a detrimental impact on their businesses, and ours. For these agencies that choose to adhere to the licensing program, a solution now exists that provides <u>absolute immunity</u>. This option was not available before our intervention. Firms that are not concerned about infringement can conduct business as usual, facing the same risks and challenges as before.

We will continue to provide information, support and training to interested court reporting agencies and reporters as the implementation date for the token system (January 1, 2004) approaches.

Please do not hesitate to contact me if you have any further questions or concerns.

Best regards,

Will A. Robberts, M.Comm, CA(SA)
Chief Operating Officer
LiveNote, Inc.

## CERTIFICATE OF SERVICE

I, John W. Guarisco, an attorney, certify that I caused copies of **Notice of Motion and Motion by the National Court Reporters Association as *Amicus Curiae* Requesting Permission to File Brief in Support of the Motions Filed by Esquire Deposition Services, LLC and Atkinson-Baker, Inc. to Alter and Amend the Judgment** to be served on the counsel of record listed on the attached Service List via the manner indicated thereon on **April 15, 2004.**

John W. Guarisco

NGEDOCS :098888.0012 1018598.1

## SERVICE LIST

### Via Hand Delivery

Rolf O. Stadheim
Joseph A. Grear
George C. Summerfield
Stadheim & Grear
400 N. Michigan Avenue
22nd Floor
Chicago, IL 60611
Attorneys for Plaintiff Engate, Inc.

Alan R. Lipton
Hinshaw & Culbertson
222 N. LaSalle Street
Chicago, IL 60601
Attorneys for Atkinson-Baker, Inc.

### Via Overnight Delivery

William T. Enos, Esq.
Robert C. Nissen, Esq.
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA 22314
Attorneys for Esquire Deposition Services, LLC

NGEDOCS :098888.0012 1018602.1