# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6204 | **DATE** | 7/30/04 |
| **CASE TITLE** | Engate vs. Esquire Deposition Services | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due___ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on ___ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on ___ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at ___ .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, the Court grants in part and denies in part Esquire and Atkinson-Baker's motion for partial summary judgment on invalidity (183-1). The Court grants Engate's motion to dismiss Esquire's unfair competition claim (235-1,2) and denies Esquire's motion for summary judgment on its unfair competition claim (247-1). The case is set for status hearing on 8/9/04 at 9:30 a.m. for the purpose of discussing what comes next in the case, which the Court assumes is a trial on the validity of the remaining patent claims. Counsel should be prepared to address whether the trial on defendants' remaining counterclaim, which seeks a declaratory judgment, will be a bench trial or a jury trial.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | AUG 0 4 2004 | 262 |
| ✓ | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | U.S. DISTRICT COURT 2004 AUG -3 PM 5: 12 Date/time received in central Clerk's Office | date mailed notice mailing deputy initials |

**DOCKETED**

**AUG 0 4 2004**

ENGATE, INC.,                                  )
                                               )
        Plaintiff,             )
                                               )
    v.                                         )     Case No.  01 C 6204
                                               )
ESQUIRE DEPOSITION SERVICES, L.L.C.            )
and ATKINSON-BAKER, INC.                       )
                                               )
        Defendants.            )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Engate, Inc. holds the rights to several patents covering certain functions that can be used

by court reporters and attorneys to enhance the utility of real-time transcription services. Engate

sued several court reporting services, including the only two remaining defendants, Esquire

Deposition Services, L.L.C., and Atkinson-Baker, Inc., alleging that they infringed the patents.

The Court has construed several disputed elements of the patents, such as what "real time"

means. *Engate, Inc. v. Esquire Deposition Services, L.L.C.,* No. 01 C 6204, 2003 WL 223306

(N.D. Ill. Jan. 30, 2003) (defining "real time" to mean "as instantaneously as possible, limited by

the ability of the reporter to transcribe text, the ability of the [computer-aided transcription]

system to convert the transcribed text into readable text, and the ability of the software/hardware

that is directly connected to the transcription means to display the converted text").

The defendants sought partial summary judgment on Engate's claim of direct

1

*262*

infringement, and the Court granted the motion, finding the defendants could not be held vicariously liable for any infringement by independent contractor court reporters who provide the bulk of the defendants' deposition services. *Engate, Inc. v. Esquire Deposition Services, L.L.C.*, 236 F. Supp. 2d 912 (N.D. Ill. 2002). The Court subsequently granted the defendants' motion for summary judgment on Engate's claim that the defendants' employee court reporters infringed Engate's patents, holding Engate had failed to offer any evidence that the employees "have actually performed the feature functionalities disclosed in Engate's patents." *Engate, Inc. v. Esquire Deposition Services, L.L.C.*, No. 01 C 6204, 2003 WL 22117805, at *8 (N.D. Ill. Sept. 10, 2003). Most recently, the Court granted the defendants' motion for summary judgment on Engate's claim that the defendants induced court reporters and lawyers to directly infringe Engate's patents. *Engate, Inc. v. Esquire Deposition Services, L.L.C.*, 01 C 6204, 2004 WL 609800 (N.D. Ill. March 26, 2004).

Although all of Engate's claims against the defendants have been adjudicated, the case remains before the Court on two counterclaims filed by the defendants. The first counterclaim alleges that twenty-two of the twenty-six claims Engate contended the defendants had infringed are invalid because, among other reasons, they were in public use, on sale or described in a printed publication at least one year before Engate filed its patent applications. *See* 35 U.S.C. § 102(b). The second counterclaim – filed exclusively by Esquire – alleges in essence that Engate sued the defendants for infringement, knowing it could not prove its case, in hopes of forcing the defendants to sign licensing agreements with Engate to avoid costly litigation. Engate asks the Court to dismiss Esquire's unfair competition claim. Esquire, in turn, has moved for summary judgment on its unfair competition claim and, with Atkinson-Baker, seeks summary judgment on

the invalidity claim. For the reasons explained below, the Court grants in part and denies in part the defendants' motion for summary judgment as to their counterclaim of invalidity. The Court grants Engate's motion to dismiss Esquire's unfair competition claim and denies Esquire's motion for summary judgment on the same claim.

## Standard of Review

As we have stated previously, summary judgment is appropriate in a patent case, as in any other case, "'where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990) (quoting Fed. R. Civ. P. 56(c)). In assessing a summary judgment motion, the Court's "function is not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'" *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002) (citation omitted). The Court evaluates admissible evidence in the record in the light most favorable to the nonmoving party. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). But "[t]he nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Board of School Trustees of North Newton School Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citation omitted). The Court must keep in mind that "[t]he purpose of the summary process is to avoid a clearly unnecessary trial; it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there is a genuine issue for trial." *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991) (citations omitted).

3

## Invalidity

The Court must presume Engate's patents are valid. 35 U.S.C. § 282. "The statutory presumption of validity under 35 U.S.C. § 282 puts the burden of proving invalidity on the party asserting it and the burden never shifts to the patentee." *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983)). The presumption of validity "can be overcome only through clear and convincing evidence." *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997)). "Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Id.*

The defendants argue that twenty-two claims in Engate's patents are invalid because they were in public use, on sale or described in a printed publication at least one year before Engate filed its patent applications. The defendants' argument is based on 35 U.S.C. § 102(b), which states that "[a] person shall be entitled to a patent unless – . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." To demonstrate that Engate's patent claims were anticipated, defendants cite several published articles describing the use of real-time transcription services in several U.S. courtrooms and the advent of closed captioning of television programming.

Engate has two general responses to the defendants' arguments. First, Engate argues that any uses of the patented technology prior to the relevant critical dates were experimental and, therefore, do not invalidate the patents. Second, Engate argues that even if real-time

4

transcription services available in courtrooms prior to the relevant critical dates were not experimental, the defendants have failed to prove that the technology in public use, on sale or described in printed publications had *all* of the features covered by Engate's patents. We will evaluate each argument in turn and then examine the validity of each claim at issue.

## A.    *Experimental usage*

The Federal Circuit has explained that "[w]hether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Smithkline Beecham Corp. v. Apotex Corp.*, 365 F.3d 1306, 1316 (Fed. Cir. 2004) (citing *3M Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)). "Public use includes 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (citing *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)). Public use does not include "[t]he use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection." *Elizabeth v. Pavement Company*, 97 U.S. 126, 134 (1877) (citations omitted). This experimental use doctrine applies "'[w]hen an evaluation period is reasonably needed to determine if the invention will serve its intended purpose.'" *New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002) (quoting *Seal-Flex, Inc. v. Athletic Track & Court Construction*, 98 F.3d 1318, 1324 (Fed. Cir. 1996)). "Once an inventor realizes that the invention as later claimed indeed works for its intended purpose, further 'experimentation' may constitute a barring public use." *Id.* (citing *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989)). And the invention need not "function perfectly in

5

order to be reduced to practice or considered as on sale or in public use. All that is necessary is that the invention be commercially operable; it may have problems which are not due to fundamental defects." *Harrington Manufacturing Co.*, 815 F.2d at 1481 (internal quotation marks omitted; quoting *In re Theis*, 610 F.2d 786, 794 n.11 (C.C.P.A. 1979)). The experimental use doctrine does not apply to "market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation." *In re Smith*, 714 F.2d 1127, 1135 (Fed. Cir. 1983) (citations omitted).

The experimental use doctrine "does not shift the burden of proof from the accused infringer to the patentee. Rather, it operates to negate application of the public use bar." *SmithKline Beecham Corp.*, 365 F.3d at 1317 (citing *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347, 1351-52 (Fed. Cir. 2002)). That means that "once the challenger of the patent has proven by clear and convincing evidence that the invention was in public use before the critical date, the burden of production shifts to the patentee to provide sufficient evidence to create a genuine issue of material fact that the use qualifies as experimental." *Id.*

The court must "look to the totality of the circumstances when evaluating whether there has been a public use within the meaning of section 102(b)." *Netscape Communications Corp.*, 295 F.3d at 1320 (citing *Sinskey*, 982 F.2d at 498). And the court must do so while keeping in mind "the policies underlying the public use bar." *Id.* (citing *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)). "The circumstances may include: the nature of the activity that occurred in public; the public access to and knowledge of the public use; whether there was any confidentiality obligation imposed on persons who observed the use; whether persons other

than the inventor performed the testing; the number of tests; the length of the test period in relation to tests of similar devices; and whether the inventor received payment for the testing." *Id.* (citations omitted). Which factors are determinative varies on a case-by-case basis. For example, "[a]lthough a written promise of confidentiality is a factor to be considered in appropriate circumstances, such as when persons other than the patentee conduct the experiments, the absence of such a promise does not make a use 'public' as a matter of law, or outweigh the undisputed fact that no information of a confidential nature was communicated to others." *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1576 (Fed. Cir. 1995) (citations omitted). Similarly, "testing at the potential customer's site does not raise a public use bar as a matter of law." *Id.*

Engate argues that the uses of real-time transcription services and related functions described in the newspaper and journal articles cited by the defendants were experimental. We will evaluate each claimed public use to determine whether the defendants have shown that the pre-critical date uses were public uses and whether Engate has raised a genuine issue of fact that the uses were actually experimental.

### 1. Computer-integrated courtrooms in the United States

In the mid-1980s, the courtrooms of federal district judges Prentice Marshall in Chicago and Roger Strand in Phoenix and a state court judge in Detroit began featuring real-time transcription services.[1] *The Courtroom of the Future*, Time, Aug. 4, 1986, at 60 (hereinafter "Time") (Defs.' Ex. 3.6); Diane Knox, *Phoenix's Courtroom of the Future*, The American

---

[1] The Court had the privilege of serving as Judge Marshall's law clerk from September 1982 through August 1984, which predated the use of real-time transcription in Judge Marshall's courtroom.

Lawyer, May 1991, at 4 (Defs.' Ex. 4.6). In these courtrooms, referred to as computer-integrated

courtrooms or CICs, the stenographer's keystrokes were translated real time into readable

English transcripts that appeared on computers for the judge and parties. Time, *supra*. The

National Court Reporters Association equipped the three courtrooms for computer-aided

transcription ("CAT") "to showcase court reporter technology." Knox, *supra*, at 6. By 1990,

court systems in Cook County, Illinois, El Paso, Texas, and St. Paul, Minnesota, had provided

funding for CICs, as had the Columbus Bar Association and Ohio Shorthand Reporters

Association. Martin H. Block, *Computer-Integrated Courtrooms: Moving the judicial system

into the twenty-first century*, Trial, September 1990, at 52 (Defs.' Ex. 8). And by 1991, local

court reporter associations, bar associations and courts had funded ten state and federal

computer-integrated courtrooms, with six others on the way. Knox, *supra*, at 6.

The hardware and software in the three original CICs were repeatedly updated. Merilyn

A. Sanchez, *The Computer-Integrated Courtroom*, Hearsay, October 1990, at 6 (Defs.' Ex 23).

As of 1991, some CICs relied on Stenograph software; others relied on Xscribe software. Jill

Berman Levy, Written remarks for the Conference on Technologies in Court Reporting

sponsored by the Institute for Court Management of the National Center for State Courts and the

National Court Reporters Association 12-13 (Feb. 15, 1991) (Defs.' Ex. 9).

> At the heart of a computer-integrated courtroom is a system known as CAT, or
> computer-aided transcription, which translates a court reporter's phonetically
> based keystrokes into English. Since every court reporter has individual ways of
> stroking various words, the translation is based on a personal "dictionary"
> developed by each reporter based on his or her particular stroking patterns. Court
> reporters have used CAT technology to make preparation of transcripts easier
> since the late seventies. But the computer-integrated courtroom takes the
> technology one step further by using CAT to provide an on-screen display of the
> transcript of courtroom proceedings just three seconds after the words are taken
> down by the court reporter.

*Id.* Computers for the judge and lawyers could be hooked up to the court reporter's CAT system so that they received real-time transcripts of the proceedings. Block, *supra*, at 51. The Phoenix CIC used a local area network ("LAN") to link the courtroom computers to a common file server. Roger G. Strand, *The Courtroom of the Future*, The Judges' Journal, Spring 1989, at 10 (Defs.' Ex. 12). The computers on the local network were "located on the judge's bench, at each counsel's table, and at the courtroom deputy clerk's station, the court reporter's position, the secretary's desk, and each law clerk's desk." *Id.* at 10. Although the computers were all linked, "[t]he LAN file server provide[d] each party and the court with separate space in the data base and with separate security codes, in order to ensure that proper handling is accorded to these confidential and privileged litigation materials." *Id.* at 11.

CICs utilized litigation support software to enhance the utility of having real-time, electronic transcripts. For example, the litigation support software used in Judge Strand's courtroom enabled the parties to search transcripts electronically, annotate the text and "'issue-code' their copies of the testimony as it happens, by assigning numbers to subjects of particular interest and marking the transcript electronically whenever the subject is mentioned." Knox, *supra*, at 9. The software could search for particular words, such as "objection," their synonyms or "pairs of words that appear near to one another (every time, for example, a client's name is mentioned within ten words of the word *cocaine*)." *Id.*; *see also, e.g.*, Ronald F. Madden, *The Coming of the Electronic Courtroom*, 5 Yearbook of Law Computers & Technology 9, 13 (1991) (Defs.' Ex. 10) (explaining how a judge could search a completed transcript for all occurrences of the word "objection" within five lines of the words "sustained" or "overruled"). And "[a]ttorneys c[ould] also program the computer to automatically highlight certain words

9

whenever they occur." Knox, *supra*, at 9. The systems users could take notes during the trial that could be "printed out with the trial transcript, either interspersed with the text or indexed to the text and printed separately." *Id.*

Courtroom computers also had access to LEXIS; WESTLAW; the Federal Judicial Center's docketing system CHASER; ASSYST, a program designed by the U.S. Sentencing Commission to aid in computing sentences under the Federal Sentencing Guidelines; and ABA/Net, which included an "electronic mail and PC-to-fax transmission capability" and enabled "multiple users to edit documents on-screen collectively." Knox, *supra*, at 8; *see also* Strand, *supra*, at 47-48. Using these features in concert with real-time transcription, "[s]ome innovative users have found that it is even possible to telecommunicate back to the home office the realtime proceedings as they are occurring in the courtroom." Madden, *supra*, at 14.

The use of real-time transcription in these courtrooms plainly constituted a public use, not an experimental one. The CICs were sponsored by the National Court Reporters Association to display the new services court reporters were capable of providing. The judges and lawyers used the technology on a day-to-day basis to do their work; they were not testing the efficacy of the system for software developers. Furthermore, no promise of confidentiality was imposed on the users. Quite the contrary, articles about the CICs, featuring interviews with judges and lawyers who used the system, were published in well-known magazines with national circulation. Although Xscribe Corp. donated the real-time transcription software used in the Phoenix courtroom, the Knox article discusses prices for setting up CICs, making clear that Xscribe's software was on sale. Knox, *supra*, at 6. When the cost of the technology is published, the court can infer that the seller wants to exploit the product commercially. *See Harrington*

10

*Manufacturing Co.*, 815 F.2d at 1481 (footnote omitted). Thus we conclude that the defendants have shown by clear and convincing evidence that the CICs in Chicago, Detroit and Phoenix were in public use, and Engate has failed to raise a genuine issue of fact that the CICs served a primarily experimental purpose. The use of functions that enhanced real-time transcription services in the CICs constituted public uses that occurred prior to the critical dates of the patents at issue in this case.

2. *Closed captioning of television programs*

The National Captioning Institute ("NCI") began providing real-time captioning of television broadcasts in 1982. Laura Malt, *Behind the screen: Getting captions on the air*, Electronic Media, March 19, 1990, at 14 (Defs.' Ex. 5.1); Marshall S. Jorpeland, *Court Reporter Helps Make The Silent Screen Speak*, NSR, April 1982, at 21 (Defs.' Ex. 18). When real-time closed captioning was first offered, it took seven seconds for the text of spoken words to appear on the television screen. Malt, *supra*. By 1990, it took only four seconds for a transcription of the spoken words to appear on the screen. *Id.*

> Using a stenotype machine, a real-time captioner "breaks" spoken words into phonetic strings. That information is sent electronically to a computer at NCI. The phonetic string is translated into words by computer and then the captioning information is sent back to the broadcast origin point where it merges with a regular broadcast signal and is transmitted. Decoder boxes, which cost about $200, "grab" the signal, translate the data into text and display the letters on the screen along with the picture.

Jerry Wolffe, United Press International, Nov. 11. 1991 (Defs.' Ex. 5.2). The text would appear on the bottom third of the television screen, scrolling three lines at a time. Malt, *supra.* Closed captioning used the same CAT technology used for real-time transcription in courtrooms. Madden, *supra*, at 12; Donald R. Johnston, *Computers: Shorthand For Change*, Fulton County

11

Daily Report, March 13, 1989 (Defs.' Ex. 24).

By 1991, NCI performed closed captioning for all prime-time network television broadcasts, cable and syndicated television shows, proceedings in the U.S. House of Representatives, and home videos. Wolffe, *supra*; Madden, *supra*, at 12; Karen Foerstel, *House Debate Now Available Closed-Caption*, Roll Call, Feb. 25, 1991 (Defs.' Ex. 19). NCI closed-captioned live programing, such as Anita Hill and Clarence Thomas' testimony during Justice Thomas' Senate confirmation hearings, Wolffe, *supra*, as well as news updates about the Persian Gulf War. *The Persian Gulf War: Answering the Call to Action*, The Washington Post, Jan. 27, 1991, at A26 (Defs.' Ex. 17). Engate has failed to raise a genuine issue of fact that any of these uses of closed captioning were merely experimental; the defendants have proven by clear and convincing evidence that the prevalence of closed captioning by the early 1990s constituted public use.

**B.** ***Whether closed captioning and technology used in CICs anticipated Engate's patents***

Having found that closed captioning and the use of real-time court reporting and litigation support software in courtrooms as of the early 1990s were public rather than experimental uses, the Court must consider whether these public uses render Engate's patents invalid. Engate argues we cannot grant the defendants' motion for summary judgment on invalidity because the defendants have not proven that the technology in public use, on sale or described in printed publications had *all* of the features covered by Engate's patents. Engate is correct that a pre-critical date description of an invention in a printed publication invalidates a patent only if "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the

12

invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). Similarly, "'[f]or a prior art reference to anticipate in terms of 35 U.S.C. § 102, every element of the claimed invention must be identically shown in a single reference.'" *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990) (quoting *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677 (Fed. Cir. 1988)); *see also Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000) (citation omitted) ("Anticipation under 35 U.S.C. § 102 requires the disclosure of a single piece of prior art of each and every limitation of a claimed invention.").

However, this rule is not without some pliancy. The single prior art disclosure "need not be express, but may anticipate by inherency where it would be appreciated by one of ordinary skill in the art." *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) (citing *Continental Can Co. USA*, 948 F.2d at 1268). The Federal Circuit has explained that "'[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates.'" *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (quoting *MEHL/Biophile International Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)). "This modest flexibility in the rule that 'anticipation' requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges." *Continental Can Co. USA*, 948 F.2d at 1269. "Whether a prior art reference anticipates a patent claim" and "[w]hether a claim limitation is inherent in a prior art reference" are questions of fact. *Finnigan Corp. v. International Trade Commission*, 180 F.3d 1354, 1362 (Fed. Cir. 1999) (citations omitted).

Engate argues that the articles cited by the defendants do not describe the technology used prior to the critical date with sufficient specificity to determine whether the pre-critical date technology had all the features disclosed in Engate's patents. Engate further argues that the declarations submitted by the defendants to supplement any vagaries in the articles do not satisfy the defendants' burden of proof. Engate correctly states that "[t]he law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." *Finnigan Corp.*, 180 F.3d at 1366. "Generally, oral testimony of prior public use must be corroborated in order to invalidate a patent." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737-38 (Fed. Cir. 2002) (citing *Finnigan Corp.*, 180 F.3d at 1366-68). "[T]he need for corroboration exists regardless of whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation (*e.g.*, because that party is the accused infringer) or is uninterested but testifying on behalf of an interested party." *Finnigan Corp.*, 180 F.3d at 1367. That means that even testimony of pre-critical date public use by a disinterested witness must be corroborated. *Id.* at 1367-68 (discussing the facts in *The Barbed-Wire Patent*, 143 U.S. 275 (1892)). The Federal Circuit has explained that this is because "'[w]itnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information,' and therefore such testimony rarely satisfies the burden upon the interested party, usually the accused infringer, to prove invalidity by clear and convincing evidence." *Id.* at 1366 (quoting *Barbed-Wire Patent*, 143 U.S. at 284).

The Court questions whether this corroboration requirement – born out of a nineteenth century dispute – should remain the standard for proving invalidity in the twenty-first century.

14

The Court can think of few areas of law in which one witness's testimony is *always* insufficient to meet the applicable burden of proof. Treason has a similarly strict corroboration requirement, *see* U.S. Const. art. III, § 3, and the federal perjury statute used to have a two-witness rule, *see Hubbard v. United States*, 514 U.S. 695, 709 (1995), but aside from that, there is no area of federal law where a similar rule applies. It is not all that easy to understand why patent invalidity, of all things, should rank with treason in terms of the need for special corroboration. Nonetheless, corroboration is what the Federal Circuit still seems to require, and we must follow that court's dictates.

Engate contends that testimonial evidence from multiple witnesses alone is never sufficient to invalidate a patent. This view is not wholly unsupported by case law. The Federal Circuit has explained that "the Supreme Court has defined the necessity of corroboration not with reference to the level of interest of the testifying witness, but rather because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." *Finnigan Corp.*, 180 F.3d at 1368. But Engate's reading of Federal Circuit precedent overstates the level of skepticism with which courts must regard testimonial evidence when considering the validity of a patent. The year before the Federal Circuit decided *Finnigan*, it implicitly accepted that testimonial evidence can satisfy the corroboration requirement under certain circumstances, *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998), and it has stated as recently as this month that the "oral testimony of a disinterested party can serve to satisfy the corroboration requirement." *Typeright Keyboard Corp. v. Microsoft Corp.*, – F.3d –, 2004 WL 1486814, at *5 (Fed. Cir. July 6, 2004). *See also Sandt v. Technology, Ltd. v. Resco Metal & Plastics Corp.*, 264

15

F.3d 1344, 1351 (Fed. Cir. 2001) (citing *Woodland Trust*, 148 F.3d at 1371).[2]

When assessing whether testimonial evidence corroborates other testimonial evidence,

the court should consider

> (1) the relationship between the corroborating witness and the alleged prior user,
> (2) the time period between the event and trial,
> (3) the interest of the corroborating witness in the subject matter in suit,
> (4) contradiction or impeachment of the witness' testimony,
> (5) the extent and details of the corroborating testimony,
> (6) the witness' familiarity with the subject matter of the patented invention and the prior use,
> (7) probability that a prior use could occur considering the state of the art at the time,
> (8) impact of the invention on the industry, and the commercial value of its practice.

*Woodland Trust*, 148 F.3d at 1371 (quoting *Price v. Symsek*, 988 F.2d 1187, 1195 n.3 (Fed. Cir.

1993)). When the patentee comes forth with evidence challenging the credibility of the witnesses

claiming prior use or invention, the trier of fact must implicitly make a credibility determination

in finding that the testimony of one witnesses (or documents, for that matter) corroborates the

testimony of the witness whose credibility has been challenged.

This has serious implications for the party seeking to invalidate a patent on summary

judgment. A judge cannot make credibility determinations when reviewing a motion for

summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus once the

---

[2] This construction of the corroboration requirement exemplifies, in this Court's view, the incongruity of the corroboration rule, which evidently applies at trials just as it applies on summary judgment. *See, e.g.*, *Woodland Trust*, 148 F.3d at 1371-73. A single interested witness's testimony alone is insufficient, and the same is true of a single disinterested witness, but under *Typeright Keyboard* evidently the whole is greater than the sum of its parts. We make this observation not to indicate any disagreement with *Typeright Keyboard* but rather to suggest that the underlying rule has seen better days and ought to be put out of its misery humanely rather than being forced to suffer the death of a thousand cuts.

patentee has come forth with evidence challenging the credibility of an affiant or deponent whose testimony is relied upon by the movant, the court cannot grant summary judgment as to invalidity even if the party seeking the declaration of invalidity has come forth with corroborating testimonial or documentary evidence. Because of the preclusive effects of a credibility challenge, the patentee must do more than simply "assert[] that the movants [sic] witnesses are not to be believed." *Typeright Keyboard Corp.*, 2004 WL 1486814, at *5. "However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movants [sic] witnesses." *Id.* (citing *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628-29 (1944)).

With these standards in mind, the Court will evaluate each claim the defendants argue is invalid to determine whether they are entitled to summary judgment.

### 1. Claim 5 of U.S. Patent No. 5,740,245

Claim 5 of the '245 patent covers a transcription network for use by attorneys examining witnesses, in which a CAT system translates the court reporter's strokes in real time to words and numbers and sends the alphabetic and numeric transcript to computers loaded with software that determines whether the transcript contains words previously selected by the user and performs a pre-defined function once the words are located.[3] The application for this patent was filed on

---

[3] The Court's description in the body of the opinion of patented claims paraphrases the claim language as understood and agreed to by the parties in light of the Court's previous construction of the claims. *See* Defs.' Am. Facts; Engate's Resp. Facts. Claim 5 of the '245 patent states exactly:

> 5. A transcription network for use by attorneys in the examination of a witness comprising:
> transcription means for generating transcript signals representative of spoken words in real time;

17

November 15, 1994, so the critical date for analyzing the validity of the patent under 35 U.S.C. 102(b) is November 15, 1993. An element essential to this claim – and all other claims the defendants seek to invalidate – is a CAT system that converts a stenographer's strokes into readable language in real time and transmits the transcript to computers used by attorneys. Articles describing these features in the early 1990s leave no doubt that this technology was available in courtrooms prior to March 24, 1992, the earliest critical date of any of Engate's patents. As quoted above, Diane Knox described how a CAT system works in a 1991 issue of The American Lawyer. Knox, *supra*, at 6. The year before, Martin Block wrote in the periodical Trial that:

> The court reporter's computer-aided transcription (CAT) system underlies and supports the CIC, integrating recent advances in computer technology. Ideally, computer terminals placed at the counsels' tables and the judge's bench can be tied into the court reporter's CAT system. This allows judges, lawyers, and litigants to see English-language text of testimony on their computer monitors moments after it is given.

Block, *supra*, at 51. Rather than repetitively recount that the CAT system that is the building block of all Engate's claims was in public use prior to the earliest critical date of Engate's patents, the Court adopts the above analysis as to these elements of Claim 5 of the '245 patent and applies it to our analysis of the validity of Engate's other patented claims.

---

> a terminal capable of performing a predefined function;
> the terminal receiving the transcript signals from the transcription means and comprising evaluation means for evaluating the transcript signals as they are received to determine whether the transcript signals contain a predefined word selection;
> the terminal responding to the evaluation means to perform the predefined function.

Claim 5 of U.S. Patent No. 5,740,245 (issued April 14, 1998).

The remaining elements of Claim 5 were also in public use prior to the critical date. Knox explained that "[a]ttorneys c[ould] also program the computer to automatically highlight certain words whenever they occur – court reporter Sanchez, for example, highlights the word *objection* in Judge Strand's file so he can easily find the questions or statements that prompt objections."[4] Knox, *supra*, at 9. Engate has failed to come forth with evidence raising a genuine issue of fact as to invalidity. The Court finds by clear and convincing evidence that each element of this claim was anticipated by the CICs in Chicago, Detroit and Phoenix.

Engate argues that the articles cited by the defendants and relied upon by the Court do not anticipate the claim because no one article describes all the elements of the claim. If the Court were concluding that Claim 5 is invalid because it was anticipated by a printed publication, Engate would be correct that the publication would have to include – either explicitly or inherently – every element of the claim. However, the basis for our conclusion that Claim 5 is invalid is that the technology described in the claim was in public use prior to the critical date. The Court cites the articles as evidentiary support for what technology was in use in the CICs, not as an independent ground for finding the claim invalid. The Court can rely on several sources to describe all the technological elements available in the courtrooms that – when used together – constituted functionalities claimed in Engate's patents.

2.    *Claim 7 of U.S. Patent No. 6,026,395*

Claim 7 of the '395 patent covers the capability to conduct natural language or Boolean

---

[4] The Court could have provided several citations in support of many of its statements describing the technology available in the computer-integrated courtrooms, but for brevity, we have limited our citations to one or two articles.

logic searches on a transcript while it is being generated.[5] The application for this patent was

filed on July 1, 1999, so the critical date for analyzing the validity of the patent is July 1, 1998.

As explained above, in the mid-1980s, computer-integrated courtrooms relied on CAT

technology to create real-time transcripts that could be stored and sent to terminals attached to

the CAT system. *See* Strand, *supra*, at 10-11 Several of the articles, including those by Judge

Strand and Diane Knox, explained that users could search transcripts for terms. *Id.*; Knox,

*supra*, at 9. However, the articles never specifically state that the searches could be conducted as

the transcript was being generated or that the searches used Boolean search terms.[6]

The defendants rely on two declarations to prove that searches could be conducted while

---

[5] Claim 7 of the '395 patent specifically states:

> 7. A method performed by a computing system during a proceeding in which a transcript representative of spoken words is generated in real-time, the method comprising:
> generating a transcript in real time;
> storing the transcript;
> accepting, during generation of the transcript, a user input representative of a first search request;
> identifying at least a portion of the stored transcript corresponding to the first search request; and
> displaying, during generation of the transcript, the at least a portion of the transcript identified.

Claim 7 of U.S. Patent No. 6,026,395 (issued Feb. 15, 2000).

[6] Searches sensitive to the relationship between search terms use Boolean logic. *A Primer in Boolean Logic*, University Libraries, University at Albany, *at* http://library.albany.edu/internet/boolean.html. "Boolean logic consists of three logical operators: or, and, not." *Id.* It enables the user to search for records that have either one term or another, both terms, or one term and not the other. *Id.* A more sophisticated variation enables searches using proximity connectors and the roots of words. *Boolean Searching*, Thurgood Marshall Law Library Research Guide, *at* http://www.law.umaryland.edu/marshall/UMLaw/researchguide/boolean.asp.

the transcript was being generated and that they could use Boolean terms. Brent Sandstrom, who

developed the Discovery and DiscoveryZX software, explained:

> Searching a real-time transcript was available in DiscoveryZX prior to March 24,
> 1992. This real-time feature was inherited from the non-real-time version of the
> software. In real-time application, the court reporter generated a transcript, which
> was immediately sent to the judge's terminal and/or attorney's terminal, typically
> a PC or laptop, where it was displayed. The transcript was indexed in real-time.
> In different configurations, the real time transcript might be indexed stored either
> on a dedicated real-time convert workstation or on an attorney station that was
> running the convert software. . . . This index was used for various purposes,
> including responding to search requests. In use, a judge or an attorney would
> input a search request including search terms and optionally including Boolean
> logic. The system would identify one or more portions of either the real-time
> transcript or an earlier transcript corresponding to the search request. The
> software would display, as a court reporter continued to generate the real-time
> transcript, at least a portion of the real-time transcript that was responsive to the
> search request.

Sandstrom Decl. ¶ 12. Judge Strand's court reporter, Merilyn Sanchez, also explained in her

declaration that the technology in use prior to the critical date enabled searches of the real-time

transcript.

> Prior to March 24, 1992, a search routine within the software could be initiated
> during a court proceeding, such that during the generation of the transcript, the
> user could search the transcript for a particular word or phrase. In real-time
> application, I generated a transcript which was immediately sent to the judge's
> terminal and/or attorney's terminal, typically a PC, where it was displayed and
> stored. (It also was stored by me on my CAT.) The judge or an attorney could
> input a search request including search terms and optionally including Boolean
> logic. Each user could independently search and identify one or more portions of
> the real-time transcript corresponding to the search request. The software would
> display (as I continued to generate the real-time transcript) at least a portion of the
> real-time transcript that was responsive to the search request.

Sanchez Decl. ¶ 9.

Engate argues the Court must deny the defendants' motion because two declarations are

never sufficient to invalidate a patent. As we previously explained, this misstates the law.

Applying the *Woodland Trust* factors, the Court must consider whether Sanchez's declaration corroborates Sandstrom's declaration. Sanchez, who served as Judge Strand's court reporter from 1986 to 1992 and remains a court reporter for the U.S. District Court in Phoenix, has no interest in the outcome of this litigation other than the fact that the defendants sought her testimony. She also has no relationship with Sandstrom other than a few conversations they had in 1989 when the Phoenix CIC used DiscoveryZX. Sandstrom Decl. ¶ 3. Yet their descriptions of the technological capabilities of litigation-support software are reinforcing. Although Sanchez's declaration recounts her activities more than ten years ago, she has an extensive familiarity with real-time court reporting and her declaration describes the capabilities of the Phoenix CIC with precision and detail. Furthermore, given the numerous technological capabilities of the Phoenix CIC, her testimony is consistent with the state of the art at the time. Therefore, the *Woodland Trust* test indicates Sanchez's declaration can be used as corroborative evidence.

However, as the developer of software with capabilities patented by Engate, Sandstrom has the type of interest in these proceedings that has given rise to the Federal Circuit's skepticism about testimonial evidence. *See Finnigan Corp.*, 180 F.3d at 1367. Under the Federal Circuit's corroboration requirement, neither Sanchez nor Sandstrom's declarations standing alone are sufficient to invalidate Engate's claim. But to rely on Sandstrom's declaration – even if in concert with the declaration of Sanchez, who is a very compelling source – would require the Court implicitly to make a credibility determination about Sandstrom. This the Court cannot do on a motion for summary judgment. For now, the Court is restricted by the confines of Fed. R. Civ. P. 56(c), and, accordingly, we must deny the defendants' motion for summary judgment on

Claim 7 of the '395 patent.

3. *Claims 4 and 8 of U.S. Patent No. 5,884,256*

Claims 4 and 8 of the '256 patent cover a computer interface that enables the user to annotate portions of the text with supplemental information related to the selected portion of the text as it is being delivered in realtime to the user's computer from the CAT system.[7] The application for Patent 5,884,256 was filed on April 9, 1998, so the critical date for analyzing the validity of the patent is April 9, 1997. The software available in Judge Strand's CIC "permit[ted] the judge and the lawyers to insert notes of their own in the testimony as it unfolds and to program the computer to high-light any key words which they expect to figure in the trial." Strand, *supra*, at 11. These notes could be interspersed through the testimony or indexed to the relevant portions of the text. Knox, *supra*, at 9. Engate has failed to come forth with evidence creating a genuine issue of fact as to whether the software capabilities available in CICs anticipated their patent claims. Accordingly, the Court grants the defendants summary judgment

---

[7] Both Claims 4 and 8 relate back to Claim 1 of the '256 patent, which states

> 1. A transcription network utilized during a testimonial proceeding by a user, the transcription network comprising:
> an attorney terminal having a user interface;
> a stenograph system that converts spoken words to text and delivers the text to the attorney terminal for real time display; and
> the user interface of the attorney terminal enabling the user to select portions of the delivered text and associate supplemental information with each of the selected portions during the testimonial proceeding.

Claim 1 of U.S. Patent No. 5,884,256 (issued March 16, 1999). Claim 4 states "[t]he transcription network of claim 1 wherein the supplemental information comprises a note that annotates a selected portion of the delivered text." Claim 4 of U.S. Patent No. 5,884,256 (issued March 16, 1999). Claim 8 states "[t]he transcription network of claim 1 wherein the supplemental information *comprises* a message relating to a selected portion of the delivered text." Claim 8 of U.S. Patent No. 5,884,256 (issued March 16, 1999).

as to the invalidity of Claims 4 and 8 of the '256 patent.

### 4. Claim 10 of U.S. Patent No. 5,884,256

Claim 10 of the '256 patent claims "[t]he transcription network of claim 1 wherein the user interface of the attorney terminal enables a user to sequentially review the selected portions by skipping at least part of unselected portions of the delivered text." Claim 10 of U.S. Patent No. 5,884,256 (issued March 16, 1999). As mentioned above, the critical date for this claim is April 9, 1997. The defendants rely on two declarations for their assertion that software enabled users to skip over portions of unselected text prior to the critical date. Sandstrom's declaration states that "[a]s a real-time transcript was received, the DiscoveryZX user interface allowed the user to search the transcript and select portions of the transcript. The selected portions might have supplemental information associated with them. The user could jump from one selected portion of the text to the next, skipping unselected portions." Sandstrom Decl. ¶ 15. Sanchez similarly states that

> [p]rior to March 24, 1992, users could review selected portions of the real-time transcript by skipping at least part of unselected portions of the transcript. As a real-time transcript was received, the software in the workstations allowed the user to search the transcript and select portions of the transcript, and to either have or not have supplemental information associated with it. The user could jump from one selected portion of the text to the next, skipping unselected portions.

Sanchez Decl. ¶ 11. The search function described by Sandstrom and Sanchez is on all fours with Claim 8 of Engate's patent. But as we previously discussed, if we relied on Sandstrom's declaration to meet the Federal Circuit's one-witness-is-not-enough rule, the Court would have to make a credibility determination, which we cannot do on summary judgment.

But that does not end our inquiry. Sandstrom offered documentary evidence to substantiate his claims about the pre-critical date capabilities of the DiscoveryZX software.

While this corroborating evidence cannot provide a basis for the Court to decide to find Sandstrom's claims credible, we can consider whether this documentary evidence alone meets the clear and convincing standard of proof to invalidate a patent.[8] A "Quick Reference Card" for DiscoveryZX prepared by the Texas Court Reporters Association for a presentation about CICs on April 27, 1991 at the NCRA Midyear Seminar explains that the F1 and F2 keys on the keyboard enable the user to "Go to Next Keyword" and "Go to Next Master Keyword." Defs.' Ex. 4.5. Similarly, the DiscoveryZX instruction manual copyrighted in 1989, states:

> [i]f you have identified one or more Keyword(s) on the Keylist, you can scroll through the current Document File in the View mode, and see your search parameters highlighted. Each time you press F1, Discovery scrolls ahead to the next Keyword; each time you press F2, the program brings the next occurrence of the Master Keyword into view (where the Master Keyword is the "first among equals" from the Keylist, and is tracked in the Concordance Window.

Defs.' Ex. 4.1. Engate argues that there is no evidence that the version of DiscoveryZX that had this capability had been installed in any CICs before the critical date. Although Engate is correct that no descriptions of the pre-critical date CICs specifically mentioned DiscoveryZX software with this feature, the user manual and reference card show that the version of DiscoveryZX that had the function at issue was *on sale* prior to the critical date, which is a basis for invalidity under 35 U.S.C. § 102(b). The Court finds the Quick Reference Card and manual provide clear and convincing evidence of invalidity that Engate has failed to call into question. Accordingly, the Court grants the defendants' motion for summary judgment as to Claim 10 of the '256 patent.

---

[8] The documentary evidence pertains to the capabilities of DiscoveryZX software. Because Sanchez did not state that she used the search-and-skip function of DiscoveryZX software, the documentary evidence does not provide the corroboration that the Federal Circuit requires for us to be able to rely on the testimonial evidence of a disinterested witness such as Sanchez.

5.    *Claim 15 of U.S. Patent No. 5,940,800*

Claim 15 of the '800 patent describes a system that enables the user to create a list of issues and choose which issues she wants the system to identify in the transcript.[9] The application for Patent 5,940,800 was filed on August 31, 1998, so the critical date for analyzing the validity of the patent is August 31, 1997. The technology available in CICs in the 1980s and early 1990s enabled users to create a list of issues that would be identified in the transcript as it was forwarded to the user's computer from the CAT system. As we mentioned above, in the Chicago, Detroit and Phoenix CICs "attorneys can 'issue-code' their copies of the testimony as it happens, by assigning numbers to subjects of particular interest and marking the transcript electronically whenever the subject is mentioned." Knox, *supra*, at 8-9. Engate has failed to create a genuine issue of fact about the issue-coding functionality available in the CICs. Accordingly, the Court holds that Claim 15 was anticipated by the CICs and is invalid under 35 U.S.C. § 102(b).

6.    *Claim 1 of U.S. Patent 5,369,704*

---

[9] Specifically, Claim 15 of the '800 patent states:

15. A method used during a transcription proceeding for categorizing transcript text, the method utilizing at least a stenographic system, a screen, and a user input device, the method comprising:
   converting, using the stenographic system, representations of spoken words to
      transcript text in real time;
   displaying the transcript text on the screen for real time review;
   displaying on the screen a list of issue categories;
   accepting, via the user input device, an input selecting at least one issue
      category from the list of issue categories; and
   associating at least a portion of the transcript text with the selected at least one
      issue category.

Claim 15 of U.S. Patent No. 5,940,800 (issued Aug. 17, 1999).

Claim 1 of the '704 patent covers the transmission of a real-time transcript from a CAT system to User 1's computer and User 2's computer, which is networked to User 1's computer and, therefore, able to send messages associated to selected parts of the transcript to User 1's computer that can be displayed on that computer with the sections of the transcript associated to the message.[10] The application for Patent 5,369,704 was filed on March 24, 1993, so the critical date for purposes of analyzing the validity of the patent is March 24, 1992. Articles discussing the technology in public use in CICs describe many of the elements comprising Claim 1. For example, the articles state that real-time transcripts could be sent to multiple computers linked to a CAT system in the CICs prior to the critical date. Knox, *supra*, at 4. The LAN network in the Phoenix CIC "electronically link[ed] a number of otherwise separate personal computer work stations together so they can communicate with each other and so they can share one central data base that is created and maintained on a specific item of computer hardware called a 'file

---

[10] More specifically, Claim 1 of the '704 patent covers:

1. A transcription network comprising:
transcription means for generating transcript signals representative of spoken
     words in real time;
an attorney's terminal receiving the transcript signals generated by said
     transcription means for display;
an associate's terminal receiving the transcript signals generated by said
     transcription means for display;
said associate's terminal providing for the generation of messages to be
     transmitted to said attorney's terminal, and, prior to transmissions,
     providing for the association of the generated messages with selected
     portions of the transcript signals; and
said attorney's terminal providing for the display of the selected portions of the
     transcript signals through access to the associated messages received from
     said associate's terminal.

Claim 1 of U.S. Patent No. 5,369,704 (issued Nov. 29, 1994).

server.'" Strand, *supra*, at 10. Users on the network could definitely send messages to each other using electronic mail or ABA/Net. Madden, *supra*, at 14; Knox, *supra*, at 8.

However, one element of Claim 1 is missing from the articles describing the CICs. No articles state – either explicitly or implicitly – that one user on the network could send a message *associated to a selected portion of the transcript* to a second user on the network and that the second user could see the *portions of the transcript associated* to the message. The defendants' only evidence that portions of the real-time transcript could be linked to messages prior to the critical date is Sanchez's declaration. Although the Court has absolutely no reason to doubt Sanchez's veracity and credibility, the Federal Circuit cautions that we cannot invalidate a patent based on uncorroborated testimonial evidence, even if the witness is not interested in the outcome of the case. *Finnigan Corp.*, 180 F.3d at 1367. Accordingly, the Court must deny the defendants' motion for summary judgment as to Claim 1 of Patent 5,269,704.

### 7. *Claim 16 of U.S. Patent No. 5,369,704*

Claim 16 of the '704 patent covers a network configuration in which the CAT system transmits real-time transcripts to several computers used by plaintiff's attorneys and several computers used by defense attorneys, but the communication link between the defense attorneys' computers are isolated from the communication link between the plaintiff attorneys' computer such that each side can send private messages to other members of her side.[11] As we mentioned

---

[11] Specifically, Claim 16 of the '704 patent covers:

> 16. A transcription network comprising:
> transcription means for producing transcript signals representative of spoken words in real time;
> a plurality of examining terminals receiving and displaying transcript signals produced by said transcription means;

above, the critical date for our analysis is March 24, 1992. As we have previously explained, the CAT system utilized in the Phoenix CIC transmitted real-time transcripts to multiple computers within the courtroom that were linked together using a local area network. Strand, *supra*, at 10. The computers were "located on the judge's bench, at each counsel's table, and at the courtroom deputy clerk's station, the court reporter's position, the secretary's desk, and each law clerk's desk." *Id.* To ensure that each party and the judge's files remained confidential, each party and the court were provided with their own space on the database protected by security codes. *Id.* at 11. ABA/Net was available on the computers, which enabled users to email from their workstations. *Id.* at 47-48.

The Court would have to make an inferential step to conclude that these elements comprise the transcription and communication network described in Claim 16. Judge Strand explained that one computer terminal was provided for each party. Claim 16 envisions a set-up in which each party has at least two computer terminals that receive the real-time transcript from the CAT system. The defendants rely on an article and a declaration to argue that more than one computer could have been added to the network for each party. First, the defendants cite an article written by Judge Frank Andrews and published in September 1992 describing the technology available in a CIC in Dallas. The article explained that computers in the Dallas CIC

> a first communication link connected to provide for the exchange of messages between said examining terminals;
> a plurality of defending terminals receiving and displaying transcript signals produced by said transcription means; and
> a second communication link isolated from said first communication link and connected to provide for the exchange of messages between said defending terminals.

Claim 16 of U.S. Patent No. 5,369,704 (issued Nov. 29, 1994).

are located at each counsel table, at the bench, and at the reporter's workstation. Each computer is part of a local area network (LAN) that makes the court reporter's trial transcript immediately available for review. (Though linked together through the LAN, each computer can function independently of the others. The LAN can be expanded to accommodate additional users as necessary.)

Frank Andrews, *Computer-Integrated Courtrooms: Enhancing Advocacy*, Trial, September 1992, at 37-38. Engate correctly points out that the article was published after the critical date and gives no indication that the Dallas CIC was in use prior to the critical date. Therefore, we cannot say that the technology available in the Dallas CIC, as described by Judge Andrews, anticipated Claim 16 of Engate's patent.

The defendants' only other support for their claim that multiple computers could be attached to the network for each party is the Sanchez declaration, which states:

Prior to March 24, 1992, users could send messages to other users, which could include part of the real-time transcript. The Phoenix CIC utilized a Novell local area network linking ten DOS 286 workstations. The work stations were located on the judge's bench, at each counsel's table, at the courtroom deputy clerk's station, at my position, in the judge's chambers, in my office, at the secretary's desk, and at each law clerk's desk. Those work stations also each had the capability to send and receive messages to and from any other work station. Those messages could include part of the transcript. The Judge and clerk could communicate via e-mail. This communication from the clerk to the judge was isolated from counsel. A single plaintiff attorney terminal was connected to the Novell[1] network. Because the CIC was configured with double cabling at each work station, a second terminal could have been provided to the plaintiff, if requested. Similarly, a second terminal could have been provided to the defendant, if requested. These second terminals would have allowed the two plaintiff terminals and the two defendant terminals to communicate in the same manner as the clerk and Judge.

Sanchez Decl. ¶ 13. As we have previously stated, Sanchez's credibility is not in issue because she is uninterested in these proceedings and Engate has not challenged her credibility, but we cannot invalidate a claim based solely on uncorroborated testimonial evidence. The Court

suspects that multiple computers for each party could have been attached to the network prior to the critical date, but we cannot say the technology we know was available in the Phoenix CIC inherently had this capability. Similarly, even though the computers in the Phoenix CICs were password protected to maintain confidentiality and had access to e-mail, it is not inherent in this set-up that courtroom technology provided isolated communication links between the multiple computers for each party such that a secure communication could be sent between two computers used by one party in the courtroom. Therefore, the defendants have failed to show that the technology available in the Phoenix CIC prior to the critical date of Patent 5,369,704 anticipated Claim 16. The Court denies the defendants' motion for summary judgment as to this claim.

   8.    *Claims 26 -28 and 32 of U.S. Patent No. 5,949,952*

Claim 26 of the '952 patent covers a real-time system that converts spoken words to text that is transmitted to user computers and captures a video image as the words are being spoken that is associated with the text in real time.[12] Claim 27 covers the additional feature that a

---

[12] Specifically, Claim 26 of the '952 patent covers:

   26. A method for facilitating the use of information from a testimonial proceeding, the method utilized at least in part during the testimonial proceeding, the method using a transcription system, a capture system and a terminal having a screen, the method comprising:
      converting, using the transcription system, spoken words to text in real time;
      capturing, using the capture system, video images showing speaking of the
         spoken words in real time;
      associating the video images with the text;
      delivering the text to the terminal; and
      displaying the text on the screen for real time review.

Claim 26 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

portion of the video images captured under Claim 26 can be delivered to the terminal.[13] Claim 28 covers the ability to view the video images and transcript simultaneously on the screen.[14] Claim 32 covers the association of a real-time transcript with video images of the speaker with the added features that the transcript can be displayed in real time on a terminal, the CAT system can store the transcript with the associated video images, and a user can use the CAT system to search for stored text and display it on the screen with the associated video images.[15] The application for this patent was filed March 12, 1997, so the critical date for our analysis under § 102(b) is March 12, 1996.

The defendants argue that Claims 26 through 28 were anticipated by closed captioning of television programming. By the early 1990s, the National Captioning Institute used a CAT system to translate stenographic strokes to readable text that was associated with a broadcast signal and transmitted so that the text could be viewed on a screen receiving the signal along with

---

[13] Specifically, Claim 27 covers "[t]he method of claim 26 further comprising: delivering at least portions of the video images to the terminal; and displaying at least portions of the video images delivered." Claim 27 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

[14] Specifically, Claim 28 covers "[t]he method of claim 27 wherein the displaying of the at least portions of the video images delivered occurs on the screen along with the displaying of the text." Claim 28 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

[15] Claim 32 specifically states:

> 32. The method of claim 26 further comprising:
> storing the text and the associated video images;
> accepting an input and performing a search of the stored text using the
>     accepted input; and
> displaying portions of the stored video images corresponding to portions of the
>     stored text located in response to the search.

Claim 32 of U.S. Patent 5,949,952 (issued Sept. 7, 1999).

the video image of the speaker. Wolffe, *supra*; *see also* Foerstel, *supra* ("The captions are then transmitted with the televised picture and appear at the bottom of the screen."). Engate's sole response is that closed captioning performed by the NCI was displayed on television screens not computer screens. We find the distinction between a television screen and a computer screen immaterial to the substance of the patent. Thus Engate has failed to raise a genuine issue of fact as to the validity of claims 26 through 28. The advent of closed captioning in the 1980s anticipated Claims 26, 27 and 28 of the '952 patent.

The defendants argue that Claim 32 was anticipated by the DiscoveryVideo ZX2 software first offered for sale on April 12, 1991. Press Release, Stenograph Legal Services Unveils New Litigation Support Product, Stenograph Corp. (April 12, 1991) (Defs.' Ex. 7.1). According to the press release:

> DiscoveryVideoZX instantly translates a court reporter's machine-written phonetic shorthand transcription of live oral testimony (which may be in the English, Spanish, German, French, Italian, Portuguese, Arabic, or Korean language) into text, while simultaneously synchronizing live or pre-recorded audio and video recordings on video tape. Once the text or transcript has been edited by the court reporter, the data is converted into DiscoveryZX format for use within SLS's full-text retrieval software.
> Full-text retrieval enables a user to free-form search and retrieve any word or string of words from a textual database or large document. A user, such as a judge or attorney, may view the entire translated transcript consisting of a number of large textual databases and video recorded sessions or select a particular segment for viewing. By a single keyboard command, the full-text retrieval software prompts the user to mount the correct video tape in the VCR and the tape, once verified, immediately searches for the corresponding video and audio segment.
> Playback of the video is accomplished in one of two ways. The DiscoveryVideoZX program runs on a standard MS-DOS-based computer that is connected to a NEC PC-VCR via an RS-232 serial cable. Once the video segment is located, the video can be played back via a standard television or video monitor or directly within the VGA monitor attached to the PC by use of a full-motion video card located within the PC. If a full-motion video card is employed, the user may view simultaneously full-motion video and the text where the search

33

originated. Full VCR control is provided for playback, pausing, fast-forwarding,
rewinding, and other VCR commands. The full-motion video card also allows for
multiple image sizes, including full-screen, 1/4 screen and 1/16 screen.
Additionally, one or more external video monitors may be connected if the video
will be used within a courtroom. This option allows monitors to be positioned for
the judge, attorneys, and jury for viewing convenience.

*Id.*

Engate argues that DiscoveryVideoZX did not anticipate Claim 32 because despite the
claims in the press release, DiscoveryVideoZX could not synchronize the transcript and video in
real time as the transcript was being created and the video recorded. In support of its position,
Engate refers to the deposition testimony of Fred Middlebrooks, a Stenograph employee, in
which he stated that DiscoveryVideoZX could not synchronize video to the transcript until the
transcript had been completed. Middlebrooks Dep. at 17 (Pl.'s Ex. L). Claim 32 does not state
that the user must be able to search for text and the associated video image in real time.
However, Claim 32 incorporates Claim 26, so the video images must be synchronized to the
transcript in real time to meet all the elements of Claim 32. Even though we found Claim 26 was
anticipated by closed captioning, we cannot conclude on the present record that the first few
elements of Claim 32 were anticipated by closed captioning and the searching and playback
elements were anticipated by DiscoveryVideoZX. There is no indication that DiscoveryVideoZX
was utilized with closed captioning, and for a prior use to anticipate a claim, all the elements of
the claim must have been in use together as described in the claim. *Apple Computer*, 234 F.3d at
20. Middlebrooks' deposition testimony creates a genuine issue of fact as to whether
DiscoveryVideoZX anticipated Claim 32 of Engate's patent, and, thus, DiscoveryVideoZX
cannot be the basis for invalidating Claim 32.

The defendants also argue that by 1992, the technology described in Claim 32 was in use

in the Dallas CIC. The court reporter in the Dallas courtroom used a CAT system to translate "the reporter's phonetic stenographic notes into readable English text . . . instantaneously." Andrews, *supra*, at 37.

> To supplement the record being produced by the court reporter's real-time translation, a camera installed in our courtroom videotapes witnesses as needed. When testimony is conducted through an interpreter, a videotape is made in case the accuracy of the translation is questioned later. With the consent of all parties, other witnesses can be videotaped for playback (just as testimony could be read back) in the event the witnesses are not available should there by a retrial.
>
> The real-time transcript is encoded with time signals by the computer. The videotape is automatically encoded with the same signals. Once the user has performed a search for a word or phrase on the transcript, the computer can then use the signals to locate that testimony quickly on the videotape. On a 4-hour videotape it takes under 2 minutes. This search capability is invaluable in editing videotaped depositions, and it is a tremendous time-saver if a jury requests that part of the testimony be read back. The testimony in question can be quickly located and played back on a courtroom monitor.

*Id.* at 38. Engate argues that because Andrews' article describing the Dallas CIC was published in September 1992, the technology it describes did not anticipate Claim 32. Engate's argument assumes that March 24, 1992 is the critical date for our analysis. Engate is mistaken. The critical date by which a prior use must have occurred to invalidate a patent is "one year prior to the date of the application." 35 U.S.C. § 102(b). As we mentioned above, the application for Patent No. 5,949,952, which is at issue, was filed on March 12, 1997. Thus the critical date for our analysis is March 12, 1996. Judge Andrews' article about the Dallas CIC was published in September 1992, so we can assume that the technology described in the article had been installed by September 1992 – more than three years before the critical date. The technology in the Dallas courtroom enabled the user to associate video with the real-time transcript created by a CAT system; store the transcript and associated video; and search the transcript and display the result along with the video associated to the portion of the transcript responsive to the search. Engate

provides no evidence raising a genuine issue of fact as to the technological capabilities of the Dallas CIC. Therefore, the Court concludes that the technology available in the Dallas CIC anticipated Claim 32. In summary, the Court grants the defendants' motion for summary judgment as to Claims 26, 27, 28 and 32 of Patent 5,949,952.

9.    *Claims 12, 13, 19 and 25 of U.S. Patent No. 6,282,510*

Claim 12 of the '510 patent covers the creation of a real-time transcript that is linked in real time to an audio recording of the speaker and can be stored in the transcription system, displayed on a screen, and searched so that the audio recording associated with the part of the transcript responsive to the search can be played.[16] Claim 13 covers resynchronizing the transcript and corresponding audio signals captured using the system described in Claim 12.[17]

---

[16] Specifically, Claim 12 of the '510 patent covers:

12. A method for facilitating the use of information from a testimonial proceeding, the method utilized at least in part during the testimonial proceeding, the method using a transcription system, a capture system and a terminal having a screen, the method comprising:
   converting, using the transcription system, spoken words to text in real time;
   capturing, using the capture system, audio signals representative of the spoken words in real time;
   associating the audio signals with the text;
   storing the text and the associated audio signals;
   displaying the text on the screen for real time review;
   accepting an input and performing a search of the stored text using the accepted input; and
   reproducing portions of the spoken words from portions of the stored audio signals corresponding to portions of the stored text located in response to the search.

Claim 12 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

[17] Claim 13 of the '510 patent specifically states that "[t]he method of claim 12 further comprising reassociating the audio signals with the text to attempt to provide accurate synchronization therebetween." Claim 13 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

Claim 19 of the patent covers the use of a CAT system to create a transcript in real time that is delivered to and displayed on a terminal and is linked in real time to audio recordings of the spoken words corresponding to the transcript.[18] Claim 25 of the patent covers a function that allows the user to search the transcript and associated audio files created according to Claim 19 and play the audio files associated with the portion of the transcript responsive to the search.[19] The application for Patent 6,282,510 was filed on February 3, 2000, so the critical date for our analysis under 35 U.S.C. § 102(b) is February 3, 1999.

The defendants argue that these four claims were anticipated by DiscoveryVideoZX.

---

[18] Claim 19 of the '510 patent specifically states:

19. A method for facilitating the use of information from a testimonial proceeding, the method utilized at least in part during the testimonial proceeding, the method using a transcription system, a capture system and a terminal having a screen, the method comprising:
converting, using the transcription system, spoken words to text in real time;
capturing, using the capture system, audio signals representative of the spoken words in real time;
associating the audio signals with the text;
delivering the text to the terminal; and
displaying the text on the screen for real time review.

Claim 19 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

[19] More precisely, Claim 25 of the '510 patent states:

25. The method of claim 19 further comprising:
storing the text and the associated audio signals;
accepting an input and performing a search of the stored text using the accepted input; and
reproducing portions of the spoken words from portions of the stored audio signals corresponding to portions of the stored text located in response to the search.

Claim 25 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

They rely on the press release describing DiscoveryVideoZX's capabilities. However, DiscoveryVideoZX cannot be the basis for invalidating Claims 12,13, 19 and 25 of Patent 6,282,510 for the same reason that it could not be used to invalidate Claim 32 of Patent 5,949,952 – that is, Engate has created a genuine issue of fact as to whether the DiscoveryVideoZX software could link a transcript to an audio or video file in real time. Even though Middlebrooks' deposition testimony only mentioned that DiscoveryVideoZX synchronized *video* files with the text after the transcript was completed and did not mention when audio files were synchronized with the text, it is reasonable to conclude that the software's synchronization process was the same for both audio and video files, as the press release on which the defendants relied equated the two functions. Accordingly, the Court denies the defendants' motion for summary judgment as to Claims 12, 13, 19 and 25 of the '510 patent.

   10.    *Claim 1 of U.S. Patent No. 5,815,639 & Claim 4 of U.S. Patent No. 5,926,787*

Claim 1 of the '639 patent and Claim 4 of the '787 patent cover a CAT system comprising a library of key strokes and their corresponding alphabetic and numeric translations or pronounceable syllables that the CAT system uses to translate the stenographer's keystrokes into exact words in real time or, if there is no exact word in the dictionary that matches the keystrokes, into phonetic syllables stored in the library.[20] The application for patent 5,815,639

---

[20] Claim 1 of the '639 patent specifically states:

   1. A reporting system for providing in real-time to a viewing terminal text representative of spoken words that is readable by a lay person, said reporting system operates on coded representations of spoken words in a first phoneme formal generated in real time, said reporting system comprising:
   a cross-reference library storing associations between coded representations of spoken words in the first phoneme format and corresponding exact alphabetic and numeric text;

was filed on May 20, 1993, so the critical date for our analysis is May 20, 1992. The application

for Patent 5,926,787 was filed on August 31, 1998, so the critical date for our analysis is August

31, 1997.

The defendants rely on two declarations to support their argument of anticipation. A

Stenograph employee stated in his declaration that

---

>  a phoneme library for storing associations between coded representations of
>       spoken words in the first phoneme format and pronounceable but not exact
>       representations of spoken words in a second phoneme format;
>  a transcriber retrieving from said cross-reference library exact alphabetic and
>       numeric text for coded representations of spoken words in the first
>       phoneme format that have associations stored in said cross-reference
>       library;
>  said transcriber retrieving from said phoneme library coded representations of
>       spoken words in the second phoneme format that are pronounceable by a
>       lay person using coded representations of spoken words in the first
>       phoneme format for which said cross-reference library stores no
>       associations; and
>  communication means for delivering both the exact alphabetic and numeric
>       text and the coded representations of spoken words in the second phoneme
>       format to the viewing terminal for display.

Claim 1 of U.S. Patent No. 5,815,639 (issued Sept. 29, 1998).

Similarly, Claim 4 of the '787 patent specifically claims that "[t]he reporting system of
claim 1 wherein said processing system utilizes a phoneme library to identify the substitute text."
Claim 4 of U.S. Patent No. 5,926,787 (issued July 20, 1999). And Claim 1, on which Claim 4
depends, states:

>  1. A reporting system used by at least a lay person, the reporting system comprising:
>  a screen;
>  a processing system that attempts to identify exact textual representations for words
>       spoken in real time;
>  said processing system identifying substitute text for those of the words spoken that
>       the processing system fails to identify exact textual representations; and
>  said processing system directing display of the exact textual representations and the
>       substitute text on the screen.

Claim 1 of U.S. Patent No. 5,926,787 (issued July 20, 1999).

[p]rior to March 24, 1992, there were CAT systems in use in this country in which the CAT system contained both phonetic and regular dictionaries. In particular, I had worked with such a CAT system, the OmniCat system. The OmniCat system had both a main dictionary and user programmable job dictionaries, which contained direct translations of keystrokes. In addition to these dictionaries, it also contained an additional dictionary which contained phonetic representations of letters and syllables. The CAT system compared the stenographic strokes to the words stored in the dictionaries. If it located an exact match, the located word was entered into the transcript. If the CAT system could not locate an exact word in the user dictionaries, it would then compare the stenographic characters to the stenographic characters stored in the phonetic library and create a phonetic representation of the untranslated word which would then go into the real-time transcript.

Middlebrooks Decl. ¶ 4. Similarly, Sanchez explained in her declaration that

The CAT system I used in the Phoenix CIC, prior to March 24, 1992, contained a main dictionary and several user programmable job dictionaries. In addition to these dictionaries, it also contained an additional dictionary which contained phonetic representations of letters and syllables. The CAT system compared the stenographic strokes to the words stored in the dictionaries. If it located an exact match, the located word was entered into the transcript. If the CAT system could not locate an exact word in the user dictionaries, it would then compare the stenographic characters to the stenographic characters stored in the phonetic library and create a phonetic representation of the untranslated word; that phonetic representation would then go into the real-time transcript.

Sanchez Decl. ¶ 14. The technology as described by Sanchez and Middlebrooks contained all the elements that comprise Claim 1 and Claim 4 of Engate's patents. But as we have mentioned before, if we relied on the testimony of an interested witness such as Middlebrooks, the Court would be making an inappropriate credibility determination on summary judgment.

The question, then, is whether the defendants have provided other evidence that satisfies the clear and convincing standard of proof. One piece of evidence is an article published in the Los Angeles Times in 1982 describing the use of a CAT system during the criminal trial of a deaf defendant. Bill Hazlett, *Computer Also on Trial in L.A. Courtroom*, L.A. Times, Feb. 19, 1982, at 3 (Defs.' Ex. 22). The computer system used in the L.A. courtroom was a CAT system

40

developed by Xscribe Corp. *Id.* at 24. During the trial,

> [c]ourt reporter Jere L. With takes down the testimony on his electronic
> stenographic machine, which translates the words into a series of alphabetical
> outlines.
>     . . .
>     "Those outlines are then transmitted to a computer terminal which sorts
> them out and matches them up with the corresponding English word," With said.
>         "Words the computer can't find, or can't recognize, are spelled out on the
> screens phonetically."

*Id.* at 3. The real-time transcript created by the system was transmitted to a "small television

screen" on the defense table and judge's bench. *Id.* The article does not corroborate Sanchez's

declaration because she never states that she was using the Xscribe system described in the

article. Engate argues that on its own, the article is insufficient to prove that the Dallas CIC

anticipated its patents because in the Dallas CIC, the transcript was delivered to a television

screen rather than a computer terminal, and it is not clear from the article that the Xscribe

software had a separate phoneme library. As we have said before, the Court finds that it is

immaterial that the transcript was delivered to a television screen rather than a computer

terminal; if the system could send the transcript to a television, it could send the output to a

computer monitor. But the Court agrees with Engate's second challenge to the article because

the only evidence that establishes that Xscribe's software utilized a separate phoneme library is

dependent, in part, on Middlebrooks' declaration.

Middlebrooks stated in his declaration that the technology he described was available in

both the OmniCat and Flexcap Cat systems. Middlebrooks Decl. ¶ 4. The Flexcap software was

owned by Xscribe Corp., which provided the system used in Los Angeles. A Flexcap User's

Manual attached to Middlebrooks' declaration explained that when the stenographer's strokes

did not match any words in the software's library, they were "translated phonetically." Defs.' Ex.

27.2 at B3. Although the user manual does not refer to a phoneme "library," it lists the phonetic translations for corresponding stenographic strokes, in effect demonstrating that the software had a phoneme library. Because the copyright for the user's manual is 1992, Engate argues that it does not necessarily constitute prior art because there is no evidence that a version of Flexcap with the features described by Middlebrooks was in use prior to May 20, 1992, the critical date of the '639 patent. Because the technology used in the L.A. courtroom in 1982 was an Xscribe system, the Court could infer that the Flexcap capabilities listed in the user's manual, which mirrored those described in the L.A. Times article, were available prior to the critical date. But this analysis relies on Middlebrooks' declaration, which the Court cannot rely on because we cannot decide on summary judgment that we find Middlebrooks to be credible. Accordingly, the Court denies the defendants' motion for summary judgment as to Claim 1 of Patent 5,815,639 and Claim 4 of Patent 5,926,787.

     *11.    Claims 1 and 3 of U.S. Patent No. 6,023,675*

Claim 1 of the '675 patent covers the real-time digital recording of a testimonial proceeding that is translated in real time by a CAT system into text that is delivered in real time to a terminal located in a different place from where the words are spoken and transmitted from the second location in real time to a terminal located in a third location, where the text is displayed.[21] Claim 3 of the patent covers the audio recording of the testimonial proceeding that

---

[21] Claim 1 of the '675 patent specifically states:

    1. A method utilized during a testimonial proceeding, the method comprising:
capturing representations of spoken words in real time at a first premises;
converting the representations into text in real time;
    delivering the text in real time to a remote system, the remote system being
        disposed at a second premises;

is sent to a location away from where the testimony is occurring and then from that location to a third location.[22] The application for the '675 patent was filed on November 3, 1998, so the critical date for analyzing the validity of the patent under 35 U.S.C. § 102(b) is November 3, 1997.

The defendants argue that Claims 1 and 3 were anticipated by closed captioning because captions made using a CAT system were transmitted from NCI's offices to at least two locations. A United Press International article explained:

> [u]sing a stenotype machine, a real-time captioner "breaks" spoken words into phonetic strings. That information is sent electronically to a computer at NCI. The phonetic string is translated into words by computer and then the captioning information is sent back to the broadcast origin point where it merges with a regular broadcast signal and is transmitted. Decoder boxes, which cost about $200, "grab" the signal, translate the data into text and display the letters on the screen along with the picture.
>
> There is only a three- to five-second delay from the time something is spoken "live" on television to having it translated into a caption and sent to the home of a hearing-impaired person, [NCI manager of public relations Morgan] Bramblet said.

---

communicatively coupling at least one terminal and the remote system;
delivering, by the remote system, the text in real time to the at least one
    terminal, the at least one terminal being disposed at least a third
    premises; and
displaying at the at least one terminal the delivered text for real time review.

Claim 1 of U.S. Patent No. 6,023,675 (issued Feb. 8, 2000).

[22] Claim 3 of the '675 patent specifically states:

3. The method of claim 1 further comprising:
capturing audio signals corresponding to the spoken words;
delivering the captured audio signals to the at least one terminal via the remote
    system; and
reproducing at the at least one terminal the delivered audio signals.

Claim 3 of U.S. Patent No. 6,023,675 (issued Feb. 8, 2000).

43

Wolffe, *supra*. Engate argues closed captioning did not anticipate Claims 1 and 3 because the text and audio signals were displayed on a television screen rather than a computer terminal. We have already rejected this distinction as immaterial. Closed-captioning as described by Wolffe is composed of the elements comprising Claims 1 and 3 of the '675 patent. Accordingly, the Court finds Claims 1 and 3 are invalid.

      12.     *Claims 4 and 6 of U.S. Patent No. 5,970,141*

Claim 4 of the '141 patent covers a transcription network comprised of a CAT system that creates a real-time transcript and transmits it in real time to an attorney's terminal and a second terminal that is in a different location from the attorney's terminal, where the second terminal is linked to the attorney's terminal in such a way that messages associated with parts of the transcript can be sent from the second terminal to the attorney's terminal.[23] Claim 6 of the same patent adds a third terminal to the above configuration that is linked to the CAT system but

---

[23] Claim 4 of the '141 patent specifically claims that "[t]he transcription network of claim 1 wherein the messages are associated with portions of the text." Claim 4 of U.S. Patent No. 5,970,141 (issued Oct. 19, 1999). Claim 1 of the '141, on which Claim 4 depends, states:

> 1. A transcription network utilized during a testimonial proceeding, the transcription network comprising:
> an attorney terminal;
> a converter assisting in the conversion of spoken words to text;
> a remote terminal disposed at a location remote from the attorney terminal and the converter;
> the converter delivering the text to the attorney terminal and to the remote terminal for real time display; and
> the remote terminal supporting communication of messages regarding the real time display to the attorney terminal.

Claim 1 of U.S. Patent No. 5,970,141 (issued Oct. 19, 1999).

not the attorney's terminal.[24] The application for the '141 patent was filed April 9, 1998, so the critical date for our analysis under 35 U.S.C. § 102(b) is April 9, 1997.

The defendants' argue Claims 4 and 6 were anticipated by the Phoenix CIC. They point out that the Phoenix CIC used a Novell local area network to link work stations for the judge, court reporter, attorneys and judge's staff. Strand, *supra*, at 10. They further argue that because the computers in the courtroom had ABA/net, *id.* at 47-48, users could send messages to other users that included a part of the real-time transcript. Sanchez Decl. ¶ 13. But these features fall short of meeting all the elements of Claim 4 and 6. The defendants provide no evidence that the transcript could be transmitted by the CAT system in real time to a remote terminal. The defendants seem to imply that the attorney terminal could e-mail the real-time transcript to the remote terminal, but that is not equivalent to having the CAT system send the real-time transcript to the remote terminal.[25] Therefore, the Court denies the defendants motion for summary judgment as to counts 4 and 6 of patent '141.

In summary, the Court grants the defendants' motion for summary judgment on their counterclaim of invalidity as to Claim 5 of U.S. Patent No. 5,740,245; Claims 4, 8 and 10 of U.S. Patent No. 5,884,256; Claim 15 of U.S. Patent No. 5,940,800; Claims 26, 27, 28 and 32 of U.S. Patent No. 5,949,952; and Claims 1 and 3 of U.S. Patent No. 6,023,675. The Court denies the defendants' motion for summary judgment on Claims 1 and 16 of U.S. Patent 5,369,704; Claim 7

---

[24] Claim 6 of the '141 patent specifically covers "[t]he transcription network of claim 1 further comprising an additional terminal communicatively coupled to the converter but not communicatively coupled to attorney terminal." Claim 6 of U.S. Patent 5,970,141 (issued Oct. 19, 1999).

[25] Nor can we assume that the remote terminal would receive the e-mailed transcript in "real time."

of U.S. Patent No. 6,026,395; Claims 12, 13, 19 and 25 of U.S. Patent No. 6,282,510; Claim 1 of U.S. Patent No. 5,815,639; Claim 4 of U.S. Patent No. 5,926,787; and Claims 4 and 6 of U.S. Patent No. 5,970,141.

## Unfair Competition

Esquire's second counterclaim alleges that Engate's suit constituted unfair competition in violation of California Business and Professions Code § 17200 *et seq.* Esquire claims that Engate alleged that Esquire had infringed 131 patented claims "without a scintilla of evidence" or a "good faith belief that Engate could prevail in litigation" in hopes "that Esquire would capitulate (as did several of the defendants) to avoid having to spend millions of dollars defending itself against this baseless suit." Esquire's Mot. for Summ. J. on Unfair Competition at 1. When Esquire first filed its counterclaim, it simply alleged that "Engate has sued Esquire on patents that it knows Esquire does not and cannot infringe" and provided an example of one patent – U.S. Patent No. 5,926,787 – it was alleged to have infringed that it could not have. Esquire's Answer to Am. Compl. ¶ 13. Engate argues that Esquire's unfair competition counterclaim should be dismissed for failure to state a claim upon which relief can be granted; Esquire argues that it is entitled to summary judgment on its counterclaim.

Engate argues that the Court should read Esquire's counterclaim as alleging that Engate improperly sued Esquire for infringing only the '787 patent mentioned in Esquire's Answer. In other words, Engate argues that it should not have to defend its initial complaint alleging that Esquire infringed 131 patented claims. The Court believes Engate's suggested reading of Esquire's counterclaim is too narrow. The counterclaim cannot be read as alleging that Engate engaged in unfair competition solely by charging Esquire with violating U.S. Patent No.

46

5,926,787. Rather, Esquire alleged that Engate had sued Esquire on "patents" – *plural* – that it knew Engate could not have infringed and prefaced its allegation regarding the '787 patent with the phrase "[f]or example." The Court therefore rejects Engate's claim that Esquire is improperly attempting to expand its counterclaim two years after filing it. Engate makes the related argument that Esquire has failed to plead its unfair competition claim with sufficient particularity. However, the Court will not consider this argument because the Court agrees with Engate that regardless of whether Esquire has met the necessary pleading requirements for stating a cause of action for unfair competition, the unfair competition claim is barred by an absolute privilege extended to communicative acts made in judicial proceedings, such as the filing of a complaint alleging infringement of 131 patented claims.

California Civil Code § 47 (b)(2) states that "[a] privileged publication or broadcast is one made: . . . [i]n any . . . judicial proceeding." The California Supreme Court has explained that "[t]he principal purpose of section 47[(b)] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213, 786 P.2d 365 (1990) (citations omitted). To effectuate this purpose, § 47(b) provides absolute immunity from liability in a derivative tort action seeking redress for prior litigation-related activity – that is, it provides absolute immunity from a claim alleging that a communication or communicative conduct in an earlier proceeding constituted a tort. *Rubin v. Green*, 4 Cal. 4th 1187, 1193, 847 P.2d 1044 (1993) (footnote omitted); *Silberg*, 50 Cal. 3d at 215, 786 P.2d 365. Although § 47(b) was initially enacted to forestall defamation claims, the California courts have extended its application to all torts except malicious prosecution. *Rubin*, 4 Cal. 4th at 1194, 847 P.2d 1044 (citation omitted); *Silberg*, 50

Cal. 3d at 212, 786 P.2d 365 (citations omitted). "Malicious prosecution actions are permitted because '[t]he policy of encouraging free access to the courts . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied." *Silberg*, 50 Cal. 3d at 216, 786 P.2d 365 (quoting *Albertson v. Raboff*, 46 Cal. 2d 375, 382, 295 P.2d 405 (1956)).

Except for communicative conduct serving as the basis for a malicious prosecution claim, "the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* at 212, 786 P.2d 365 (citations omitted). The California Supreme Court has clarified that "[t]he 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." *Id.* at 220, 786 P.2d 365 (citations omitted). And "[a]ny doubt as to whether the privilege applies is resolved in favor of applying it." *Home Insurance Co. v. Zurich Insurance Co.*, 96 Cal. App. 4th 17, 23, 116 Cal. Rptr. 2d 583, 587 (2002) (citation omitted).

Esquire argues that the § 47(b) privilege only bars causes of action seeking redress for slanderous or libelous communications made in a court proceeding and, thus, does not apply to its counterclaim. The California Supreme Court has not construed § 47(b) so narrowly. To the contrary, in *Rubin v. Green* the California Supreme Court concluded that § 47(b) barred a lawsuit filed by the owner of a mobile home park alleging that the attorneys who sued him had engaged in solicitation by talking to potential plaintiffs and filing the suit. Much like Esquire, Rubin alleged that the defendants had tried to stir up "'frivolous litigation as a means to profit unjustly at [Rubin's] expense.'" *Rubin*, 4 Cal. 4th at 1191, 847 P.2d 1044. Rubin's suit was not based on

any particular slanderous or libelous statements. Yet the court applied § 47(b), reasoning that it "c[ould] imagine few communicative acts more clearly within the scope of the privilege than those alleged in the amended complaint, that is, meeting and discussing with Cedar Village residents park conditions and the merits of the proposed failure-to-maintain lawsuit, and filing the complaint and subsequent pleadings in the litigation." *Rubin*, 4 Cal. 4th at 1195, 847 P.2d 1044. The court concluded that under § 47(b), malicious prosecution – "provided the requisite conditions are pleaded and proven" – was the only cause of action Rubin could pursue against the lawyers for filing the allegedly frivolous case against him. *Id.* at 1200, 847 P.2d 1044.

Rubin argued that even if § 47(b) barred his solicitation claim, he should be able to maintain a claim of unfair competition against the lawyers for stirring up a baseless suit against him for their own profit. The California Supreme Court found that § 47(b) barred Rubin's unfair competition claim under the Business and Professions Code. The court reasoned that a party cannot avoid the heightened pleading requirements necessary to maintain a malicious prosecution claim by renaming the cause of action to allege a statutory offense such as unfair competition. *Id.* at 1203, 847 P.2d 1044. The court explained:

> In the typical derivative action filed in the wake of allegedly tortious litigation-related communications, the aggrieved plaintiff had been a party in the antecedent proceeding in which the challenged communications occurred, and now seeks redress for injuries alleged to have resulted from them. Unless the conditions requisite to a malicious prosecution action are pleaded and proven, section 47(b) denies relief in such circumstances, not only because that result is deemed necessary to secure the greater interest in ensuring unhindered access to the courts, but also because, as we noted in *Silberg, supra*, 50 Cal. 3d 205, the original litigation itself provides an efficient forum in which to "expos[e] during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result."

*Id.* at 1203, 847 P.2d 1044 (citing *Silberg*, 50 Cal. 3d at 214, 786 P.2d 365).

Similarly, in *Kashian v. Harriman* a state appellate court considering an unfair competition claim concluded that the filing of "meritless lawsuits on behalf of 'sham plaintiffs' to deceive the defendants into believing the suits had more support than they did in fact" was the type of communicative conduct that was covered by the §47(b) privilege. *Kashian v. Harriman*, 98 Cal. App. 4th 892, 917, 120 Cal. Rptr. 2d 576, 596 (2002) (citation omitted). Ultimately, the court found that the unfair competition claim was not barred by § 47(b), because the plaintiff who filed the unfair competition claim had not been a party in the allegedly "meritless lawsuits" that were the basis of the unfair competition claim. *Id.* at 924, 120 Cal. Rptr. 2d at 602. However, *Rubin* and *Kashian* make clear that the § 47(b) privilege bars causes of action seeking redress for the filing of baseless lawsuits – unless the plaintiff (or counterclaimant) pleads the elements of malicious prosecution. Accordingly, the Court grants Engate's motion to dismiss Esquire's unfair competition claim.

### Conclusion

For the reasons stated above, the Court grants in part and denies in part Esquire and Atkinson-Baker's motion for partial summary judgment on invalidity [docket # 183-1]. The Court grants Engate's motion to dismiss Esquire's unfair competition claim [docket # 235-1, 235-2] and denies Esquire's motion for summary judgment on its unfair competition claim [docket # 247-1]. The case is set for a status hearing on August 9, 2004 at 9:30 a.m. for the purpose of discussing what comes next in the case, which the Court assumes is a trial on the validity of the remaining patent claims. Counsel should be prepared to address whether the trial

on defendants' remaining counterclaim, which seeks a declaratory judgment, will be a bench trial or a jury trial.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 30, 2004