# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 6204 | **DATE** | 8/19/2004 |
| **CASE TITLE** | | Engate vs. Esquire | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants in part and denies in part Esquire and Atkinson-Baker's motion for partial summary judgment on invalidity (183). The Court grants Engate's motion to dismiss Esquire's unfair competition claim (235) and denies Esquire's motion for summary judgment on its unfair competition claim (247). The Court grants Engate's motion for reconsideration (267), but denies the defendants' motion for reconsideration (266). The Court's 7/30/04 Memorandum Opinion and Order is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | AUG 2 3 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 274 |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| OR | courtroom deputy's initials | U.S. DISTRICT COURT 2004 AUG 20 PM 3:0 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ENGATE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 01 C 6204 |
| | ) | |
| ESQUIRE DEPOSITION SERVICES, L.L.C. | ) | |
| and ATKINSON-BAKER, INC. | ) | |
| | ) | |
| Defendants. | ) | |

AMENDED
MEMORANDUM OPINION AND ORDER[1]

**DOCKETED**

AUG 2 3 2004

MATTHEW F. KENNELLY, District Judge:

Engate, Inc. holds the rights to several patents covering certain functions that can be used

by court reporters and attorneys to enhance the utility of real-time transcription services. Engate

sued several court reporting services, including the only two remaining defendants, Esquire

Deposition Services, L.L.C., and Atkinson-Baker, Inc., alleging that they infringed the patents.

The Court has construed several disputed elements of the patents, such as what "real time"

means. *Engate, Inc. v. Esquire Deposition Services, L.L.C.,* No. 01 C 6204, 2003 WL 223306

(N.D. Ill. Jan. 30, 2003) (defining "real time" to mean "as instantaneously as possible, limited by

the ability of the reporter to transcribe text, the ability of the [computer-aided transcription]

system to convert the transcribed text into readable text, and the ability of the software/hardware

_____

[1] The Court amends the opinion in accordance with its rulings on the plaintiff's and
defendants' motions to reconsider. We grant the plaintiff's motion to reconsider, which affects
the outcome on Claim 32 of the '952 patent. We deny the defendants' motion to reconsider but
have amended our opinion in various respects to address arguments contained in that motion.

1

274

that is directly connected to the transcription means to display the converted text").

The defendants sought partial summary judgment on Engate's claim of direct infringement, and the Court granted the motion, finding the defendants could not be held vicariously liable for any infringement by independent contractor court reporters who provide the bulk of the defendants' deposition services. *Engate, Inc. v. Esquire Deposition Services, L.L.C.,* 236 F. Supp. 2d 912 (N.D. Ill. 2002). The Court subsequently granted the defendants' motion for summary judgment on Engate's claim that the defendants' employee court reporters infringed Engate's patents, holding Engate had failed to offer any evidence that the employees "have actually performed the feature functionalities disclosed in Engate's patents." *Engate, Inc. v. Esquire Deposition Services, L.L.C.,* No. 01 C 6204, 2003 WL 22117805, at \*8 (N.D. Ill. Sept. 10, 2003). Most recently, the Court granted the defendants' motion for summary judgment on Engate's claim that the defendants induced court reporters and lawyers to directly infringe Engate's patents. *Engate, Inc. v. Esquire Deposition Services, L.L.C.,* 01 C 6204, 2004 WL 609800 (N.D. Ill. March 26, 2004).

Although all of Engate's claims against the defendants have been adjudicated, the case remains before the Court on two counterclaims filed by the defendants. The first counterclaim alleges that twenty-two of the twenty-six claims Engate contended the defendants had infringed are invalid because, among other reasons, they were in public use, on sale or described in a printed publication at least one year before Engate filed its patent applications. *See* 35 U.S.C. § 102(b). The second counterclaim – filed exclusively by Esquire – alleges in essence that Engate sued the defendants for infringement, knowing it could not prove its case, in hopes of forcing the defendants to sign licensing agreements with Engate to avoid costly litigation. Engate asks the

Court to dismiss Esquire's unfair competition claim. Esquire, in turn, has moved for summary judgment on its unfair competition claim and, with Atkinson-Baker, seeks summary judgment on the invalidity claim. For the reasons explained below, the Court grants in part and denies in part the defendants' motion for summary judgment as to their counterclaim of invalidity. The Court grants Engate's motion to dismiss Esquire's unfair competition claim and denies Esquire's motion for summary judgment on the same claim.

### Standard of Review

As we have stated previously, summary judgment is appropriate in a patent case, as in any other case, "'where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F.2d 670, 672 (Fed. Cir. 1990) (quoting Fed. R. Civ. P. 56(c)). In assessing a summary judgment motion, the Court's "function is not to weigh the evidence but merely to determine if 'there is a genuine issue for trial.'" *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002) (citation omitted). The Court evaluates admissible evidence in the record in the light most favorable to the nonmoving party. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998). But "[t]he nonmovant will successfully oppose summary judgment only when it presents 'definite, competent evidence to rebut the motion.'" *Vukadinovich v. Board of School Trustees of North Newton School Corp.*, 278 F.3d 693, 699 (7th Cir. 2002) (citation omitted). The Court must keep in mind that "[t]he purpose of the summary process is to avoid a clearly unnecessary trial; it is not designed to substitute lawyers' advocacy for evidence, or affidavits for examination before the fact-finder, when there

is a genuine issue for trial." *Continental Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1265 (Fed. Cir. 1991) (citations omitted).

## Invalidity

The Court must presume Engate's patents are valid. 35 U.S.C. § 282. "The statutory presumption of validity under 35 U.S.C. § 282 puts the burden of proving invalidity on the party asserting it and the burden never shifts to the patentee." *Sinskey v. Pharmacia Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed. Cir. 1983)). The presumption of validity "can be overcome only through clear and convincing evidence." *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997)). "Thus, a moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise." *Id.*

The defendants argue that twenty-two claims in Engate's patents are invalid because they were in public use, on sale or described in a printed publication at least one year before Engate filed its patent applications. The defendants' argument is based on 35 U.S.C. § 102(b), which states that "[a] person shall be entitled to a patent unless – . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." To demonstrate that Engate's patent claims were anticipated, defendants cite several published articles describing the use of real-time transcription services in several U.S. courtrooms and the advent of closed captioning of television programming.

Engate has two general responses to the defendants' arguments. First, Engate argues that

any uses of the patented technology prior to the relevant critical date were experimental and, therefore, do not invalidate the patents. Second, Engate argues that even if real-time transcription services available in courtrooms prior to the critical date were not experimental, the defendants have failed to prove that the technology in public use, on sale or described in printed publications had *all* of the features covered by Engate's patents. We will evaluate each argument in turn and then examine the validity of each claim at issue.

## A.    *Experimental usage*

The Federal Circuit has explained that "[w]hether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Smithkline Beecham Corp. v. Apotex Corp.*, 365 F.3d 1306, 1316 (Fed. Cir. 2004) (citing *3M Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002)). "Public use includes 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Netscape Communications Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir. 2002) (citing *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)). Public use does not include "[t]he use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection." *Elizabeth v. Pavement Company*, 97 U.S. 126, 134 (1877) (citations omitted). This experimental use doctrine applies "'[w]hen an evaluation period is reasonably needed to determine if the invention will serve its intended purpose.'" *New Railhead Manufacturing, L.L.C. v. Vermeer Manufacturing Co.*, 298 F.3d 1290, 1297 (Fed. Cir. 2002) (quoting *Seal-Flex, Inc. v. Athletic Track & Court Construction*, 98 F.3d 1318, 1324 (Fed. Cir. 1996)). "Once an inventor realizes that the invention as later claimed indeed works for its intended purpose, further

'experimentation' may constitute a barring public use." *Id.* (citing *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed. Cir. 1989)). And the invention need not "function perfectly in order to be reduced to practice or considered as on sale or in public use. All that is necessary is that the invention be commercially operable; it may have problems which are not due to fundamental defects." *Harrington Manufacturing Co.*, 815 F.2d at 1481 (internal quotation marks omitted; quoting *In re Theis*, 610 F.2d 786, 794 n.11 (C.C.P.A. 1979)). The experimental use doctrine does not apply to "market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation." *In re Smith*, 714 F.2d 1127, 1135 (Fed. Cir. 1983) (citations omitted).

The experimental use doctrine "does not shift the burden of proof from the accused infringer to the patentee. Rather, it operates to negate application of the public use bar." *SmithKline Beecham Corp.*, 365 F.3d at 1317 (citing *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347, 1351-52 (Fed. Cir. 2002)). That means that "once the challenger of the patent has proven by clear and convincing evidence that the invention was in public use before the critical date, the burden of production shifts to the patentee to provide sufficient evidence to create a genuine issue of material fact that the use qualifies as experimental." *Id.*

The court must "look to the totality of the circumstances when evaluating whether there has been a public use within the meaning of section 102(b)." *Netscape Communications Corp.*, 295 F.3d at 1320 (citing *Sinskey*, 982 F.2d at 498). And the court must do so while keeping in mind "the policies underlying the public use bar." *Id.* (citing *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994)). "The circumstances may include: the nature of the activity

that occurred in public; the public access to and knowledge of the public use; whether there was any confidentiality obligation imposed on persons who observed the use; whether persons other than the inventor performed the testing; the number of tests; the length of the test period in relation to tests of similar devices; and whether the inventor received payment for the testing." *Id.* (citations omitted). Which factors are determinative varies on a case-by-case basis. For example, "[a]lthough a written promise of confidentiality is a factor to be considered in appropriate circumstances, such as when persons other than the patentee conduct the experiments, the absence of such a promise does not make a use 'public' as a matter of law, or outweigh the undisputed fact that no information of a confidential nature was communicated to others." *Allied Colloids Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1576 (Fed. Cir. 1995) (citations omitted). Similarly, "testing at the potential customer's site does not raise a public use bar as a matter of law." *Id.*

Engate argues that the uses of real-time transcription services and related functions described in the newspaper and journal articles cited by the defendants were experimental. We will evaluate each claimed public use to determine whether the defendants have made a *prima facie* case that the pre-critical date uses were public uses and whether Engate has raised a genuine issue of fact that the uses were actually experimental.

1.   *Computer-integrated courtrooms in the United States*

In the mid-1980s, the courtrooms of federal district judges Prentice Marshall in Chicago and Roger Strand in Phoenix and a state court judge in Detroit began featuring real-time transcription services.[2] *The Courtroom of the Future*, Time, Aug. 4, 1986, at 60 (hereinafter

---

[2] The Court had the privilege of serving as Judge Marshall's law clerk from September 1982 through August 1984, which predated the use of real-time transcription in Judge Marshall's

"Time") (Defs.' Ex. 3.6); Diane Knox, *Phoenix's Courtroom of the Future*, The American

Lawyer, May 1991, at 4 (Defs.' Ex. 4.6). In these courtrooms, referred to as computer-integrated

courtrooms or CICs, the stenographer's keystrokes were translated real time into readable

English transcripts that appeared on computers for the judge and parties. Time, *supra*. The

National Court Reporters Association equipped the three courtrooms for computer-aided

transcription ("CAT") "to showcase court reporter technology." Knox, *supra*, at 6. By 1990,

court systems in Cook County, Illinois, El Paso, Texas, and St. Paul, Minnesota, had provided

funding for CICs, as had the Columbus Bar Association and Ohio Shorthand Reporters

Association. Martin H. Block, *Computer-Integrated Courtrooms: Moving the judicial system

into the twenty-first century*, Trial, September 1990, at 52 (Defs.' Ex. 8). And by 1991, local

court reporter associations, bar associations and courts had funded ten state and federal

computer-integrated courtrooms, with six others on the way. Knox, *supra*, at 6.

The hardware and software in the three original CICs were repeatedly updated. Merilyn

A. Sanchez, *The Computer-Integrated Courtroom*, Hearsay, October 1990, at 6 (Defs.' Ex 23).

As of 1991, some CICs relied on Stenograph software; others relied on Xscribe software. Jill

Berman Levy, Written remarks for the Conference on Technologies in Court Reporting

sponsored by the Institute for Court Management of the National Center for State Courts and the

National Court Reporters Association 12-13 (Feb. 15, 1991) (Defs.' Ex. 9).

> At the heart of a computer-integrated courtroom is a system known as CAT, or
> computer-aided transcription, which translates a court reporter's phonetically
> based keystrokes into English. Since every court reporter has individual ways of
> stroking various words, the translation is based on a personal "dictionary"
> developed by each reporter based on his or her particular stroking patterns. Court
> reporters have used CAT technology to make preparation of transcripts easier

---

courtroom.

> since the late seventies. But the computer-integrated courtroom takes the technology one step further by using CAT to provide an on-screen display of the transcript of courtroom proceedings just three seconds after the words are taken down by the court reporter.

*Id.* Computers for the judge and lawyers could be hooked up to the court reporter's CAT system so that they received real-time transcripts of the proceedings. Block, *supra*, at 51. The Phoenix CIC used a local area network ("LAN") to link the courtroom computers to a common file server. Roger G. Strand, *The Courtroom of the Future*, The Judges' Journal, Spring 1989, at 10 (Defs.' Ex. 12). The computers on the local network were "located on the judge's bench, at each counsel's table, and at the courtroom deputy clerk's station, the court reporter's position, the secretary's desk, and each law clerk's desk." *Id.* at 10. Although the computers were all linked, "[t]he LAN file server provide[d] each party and the court with separate space in the data base and with separate security codes, in order to ensure that proper handling is accorded to these confidential and privileged litigation materials." *Id.* at 11.

CICs utilized litigation support software to enhance the utility of having real-time, electronic transcripts. For example, the litigation support software used in Judge Strand's courtroom enabled the parties to search transcripts electronically, annotate the text and "'issue-code' their copies of the testimony as it happens, by assigning numbers to subjects of particular interest and marking the transcript electronically whenever the subject is mentioned." Knox, *supra*, at 9. The software could search for particular words, such as "objection," their synonyms or "pairs of words that appear near to one another (every time, for example, a client's name is mentioned within ten words of the word *cocaine*)." *Id.*; *see also, e.g.*, Ronald F. Madden, *The Coming of the Electronic Courtroom*, 5 Yearbook of Law Computers & Technology 9, 13 (1991)

(Defs.' Ex. 10) (explaining how a judge could search a completed transcript for all occurrences of the word "objection" within five lines of the words "sustained" or "overruled"). And "[a]ttorneys c[ould] also program the computer to automatically highlight certain words whenever they occur." Knox, *supra*, at 9. The systems users could take notes during the trial that could be "printed out with the trial transcript, either interspersed with the text or indexed to the text and printed separately." *Id.*

Courtroom computers also had access to LEXIS; WESTLAW; the Federal Judicial Center's docketing system CHASER; ASSYST, a program designed by the U.S. Sentencing Commission to aid in computing sentences under the Federal Sentencing Guidelines; and ABA/Net, which included an "electronic mail and PC-to-fax transmission capability" and enabled "multiple users to edit documents on-screen collectively." Knox, *supra*, at 8; *see also* Strand, *supra*, at 47-48. Using these features in concert with real-time transcription, "[s]ome innovative users have found that it is even possible to telecommunicate back to the home office the realtime proceedings as they are occurring in the courtroom." Madden, *supra*, at 14.

The use of real-time transcription in these courtrooms plainly constituted a public use, not an experimental one. The CICs were sponsored by the National Court Reporters Association to display the new services court reporters were capable of providing. The judges and lawyers used the technology on a day-to-day basis to do their work; they were not testing the efficacy of the system for software developers. Furthermore, no promise of confidentiality was imposed on the users. Quite the contrary, articles about the CICs, featuring interviews with judges and lawyers who used the system, were published in well-known magazines with national circulation. Although Xscribe Corp. donated the real-time transcription software used in the Phoenix

courtroom, the Knox article discusses prices for setting up CICs, making clear that Xscribe's software was on sale. Knox, *supra*, at 6. When the cost of the technology is published, the court can infer that the seller wants to exploit the product commercially. *See Harrington Manufacturing Co.*, 815 F.2d at 1481 (footnote omitted). Thus we conclude that the defendants have shown by clear and convincing evidence that the CICs in Chicago, Detroit and Phoenix were in public use, and Engate has failed to raise a genuine issue of fact that the CICs served a primarily experimental purpose. The use of functions that enhanced real-time transcription services in the CICs constituted public uses that occurred prior to the critical date of the patents at issue in this case.

### 2.    *Closed captioning of television programs*

The National Captioning Institute ("NCI") began providing real-time captioning of television broadcasts in 1982. Laura Malt, *Behind the screen: Getting captions on the air*, Electronic Media, March 19, 1990, at 14 (Defs.' Ex. 5.1); Marshall S. Jorpeland, *Court Reporter Helps Make The Silent Screen Speak*, NSR, April 1982, at 21 (Defs.' Ex. 18). When real-time closed captioning was first offered, it took seven seconds for the text of spoken words to appear on the television screen. Malt, *supra*. By 1990, it took only four seconds for a transcription of the spoken words to appear on the screen. *Id.*

> Using a stenoptype machine, a real-time captioner "breaks" spoken words into phonetic strings. That information is sent electronically to a computer at NCI. The phonetic string is translated into words by computer and then the captioning information is sent back to the broadcast origin point where it merges with a regular broadcast signal and is transmitted. Decoder boxes, which cost about $200, "grab" the signal, translate the data into text and display the letters on the screen along with the picture.

Jerry Wolffe, United Press International, Nov. 11. 1991 (Defs.' Ex. 5.2). The text would appear

on the bottom third of the television screen, scrolling three lines at a time.  Malt, *supra.*  Closed

captioning used the same CAT technology used for real-time transcription in courtrooms.

Madden, *surpa*, at 12; Donald R. Johnston, *Computers:  Shorthand For Change*, Fulton County

Daily Report, March 13, 1989 (Defs.' Ex. 24).

By 1991, NCI performed closed captioning for all prime-time network television

broadcasts, cable and syndicated television shows, proceedings in the U.S. House of

Representatives, and home videos.  Wolffe, *supra*; Madden, *supra*, at 12; Karen Foerstel, *House*

*Debate Now Available Closed-Caption*, Roll Call, Feb. 25, 1991 (Defs.' Ex. 19).  NCI closed-

captioned live programing, such as Anita Hill and Clarence Thomas' testimony during Justice

Thomas' Senate confirmation hearings, Wolffe, *supra*, as well as news updates about the Persian

Gulf War.  *The Persian Gulf War:  Answering the Call to Action*, The Washington Post, Jan. 27,

1991, at A26 (Defs.' Ex. 17).  Engate has failed to raise a genuine issue of fact that any of these

uses of closed captioning were merely experimental; the defendants have proven by clear and

convincing evidence that the prevalence of closed captioning by the early 1990s constituted

public use.

**B.      *Whether closed captioning and technology used in CICs anticipated Engate's patents***

Having found that closed captioning and the use of real-time court reporting and litigation

support software in courtrooms as of the early 1990s were public rather than experimental uses,

the Court must consider whether these public uses render Engate's patents invalid.   Engate

argues we cannot grant the defendants' motion for summary judgment on invalidity because the

defendants have not proven that the technology in public use, on sale or described in printed

publications had *all* of the features covered by Engate's patents.  Engate is correct that a pre-

critical date description of an invention in a printed publication invalidates a patent only if "the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted). Similarly, "'[f]or a prior art reference to anticipate in terms of 35 U.S.C. § 102, every element of the claimed invention must be identically shown in a single reference.'" *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990) (quoting *Diversitech Corp. v. Century Steps, Inc.*, 850 F.2d 675, 677 (Fed. Cir. 1988)); *see also Apple Computer, Inc. v. Articulate Systems, Inc.*, 234 F.3d 14, 20 (Fed. Cir. 2000) (citation omitted) ("Anticipation under 35 U.S.C. § 102 requires the disclosure of a single piece of prior art of each and every limitation of a claimed invention.").

However, this rule is not without some pliancy. The single prior art disclosure "need not be express, but may anticipate by inherency where it would be appreciated by one of ordinary skill in the art." *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995) (citing *Continental Can Co. USA*, 948 F.2d at 1268). The Federal Circuit has explained that "'[u]nder the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claimed limitations, it anticipates.'" *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (quoting *MEHL/Biophile International Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)). "This modest flexibility in the rule that 'anticipation' requires that every element of the claims appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges." *Continental Can Co.*

*USA*, 948 F.2d at 1269. "Whether a prior art reference anticipates a patent claim" and "[w]hether a claim limitation is inherent in a prior art reference" are questions of fact. *Finnigan Corp. v. International Trade Commission*, 180 F.3d 1354, 1362 (Fed. Cir. 1999) (citations omitted).

Engate argues that the articles cited by the defendants do not describe the technology used prior to the critical date with sufficient specificity to determine whether the pre-critical date technology had all the features disclosed in Engate's patents. Engate further argues that the declarations submitted by the defendants to supplement any vagaries in the articles do not satisfy the defendants' burden of proof. Engate correctly states that "[t]he law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony." *Finnigan Corp.*, 180 F.3d at 1366. "Generally, oral testimony of prior public use must be corroborated in order to invalidate a patent." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737-38 (Fed. Cir. 2002) (citing *Finnigan Corp.*, 180 F.3d at 1366-68). "[T]he need for corroboration exists regardless of whether the party testifying concerning the invalidating activity is interested in the outcome of the litigation (*e.g.*, because that party is the accused infringer) or is uninterested but testifying on behalf of an interested party." *Finnigan Corp.*, 180 F.3d at 1367. That means that even testimony of pre-critical date public use by a disinterested witness must be corroborated. *Id.* at 1367-68 (discussing the facts in *The Barbed-Wire Patent*, 143 U.S. 275 (1892)). The Federal Circuit has explained that this is because "'[w]itnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information,' and therefore such testimony rarely satisfies the burden upon the interested party, usually the accused infringer, to prove invalidity by clear and convincing evidence." *Id.* at 1366 (quoting

*Barbed-Wire Patent*, 143 U.S. at 284).

The defendants argue the corroboration requirement does not apply to disinterested non-parties. They rely on *Thomson v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999), in which the Federal Circuit "h[e]ld that corroboration is required only when the testifying inventor is asserting a claim of derivation or priority of his or her invention and is a named party, an employee of or assignor to a named party, or otherwise is in a position where he or she stands to directly and substantially gain by his or her invention being found to have priority over the patent claims at issue." Although the Federal Circuit held in *Finnigan*, four and a half months after *Thomson*, that the corroboration requirement applies to disinterested non-parties, the defendants argue that the Court must follow *Thomson* because the *Finnigan* court merely distinguished *Thomson* but did not overrule it (and lacked the authority to do so). The defendants are correct that the Court cannot disregard *Thomson*, but because *Finnigan* has never been overruled, the Court cannot ignore that case either. Thus the Court is faced with an intra-circuit split.

The Court questions whether *Finnigan*'s strong version of the corroboration requirement – born out of a nineteenth century dispute – should remain the standard for proving invalidity in the twenty-first century. The Court can think of few areas of law in which one witness's testimony is *always* insufficient to meet the applicable burden of proof. Treason has a similarly strict corroboration requirement, *see* U.S. Const. art. III, § 3, and the federal perjury statute used to have a two-witness rule, *see Hubbard v. United States*, 514 U.S. 695, 709 (1995), but aside from that, there is no area of federal law where a similar rule applies. It is not all that easy to understand why patent invalidity, of all things, should rank with treason in terms of the need for special corroboration. Nonetheless, the Court is not prepared to disregard *Finnigan* and several

15

subsequent cases that have relied on *Finnigan*'s understanding of the corroboration requirement.

The Court has found only one Federal Circuit case in which the court, relying on *Thomson*, did not require corroboration of a disinterested or nonparty witness. *See Eisenberg v. Alimed, Inc.*, 243 F.3d 555 (Fed. Cir. 2000) (unpublished). *See also Ecolab, Inc. v. Gardner Mfg. Co.*, No. 98-2294, 2002 WL 31641260 (D. Minn. Nov. 20, 2002) (following *Thomson* in ruling on motion to reconsider opinion following *Finnigan*). In contrast, several published Federal Circuit cases relying on *Finnigan* have said testimony must be corroborated regardless of the witness's level of interest in the litigation.[3] *See, e.g., TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004); *Dow Chemical Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1378 (Fed. Cir. 2003); *Juicy Whip, Inc.*, 292 F.3d at 738; *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1217 (Fed. Cir. 2002). We agree with Judge Sachs of the Western District of Missouri who, in deciding a summary judgment motion, said that even though *Thomson* has not been overruled, in light of all the "[s]ubsequent decisions [that] have either returned to the rule as it was enunciated before *Thomson*, *see Oney v. Ratliff*, 182 F.3d 893, 896-97 (Fed. Cir. 1999), or have distinguished *Thomson* under circumstances suggesting that its holding may not be viable, *see Finnigan*, 180 F.3d at 1367-68," the Court's "safe[st]" option is "to operate under the assumption that the corroboration requirement still exists." *K & K Jump Start/Chargers, Inc. v. Schumacher Electric Corp.*, 82 F. Supp. 2d 1012, 1018 n.7 (W.D. Mo. 2000). One can only hope that the Federal Circuit will resolve the conflict created by its decisions on this issue.

Although the Court will follow the strong version of the corroboration requirement, we

---

[3] The Federal Circuit also relied on *Finnigan* in an unpublished decision, *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 215 F.3d 1351, at *4 (Fed. Cir. 1999) (unpublished).

do not agree with Engate's overly narrow definition of what constitutes corroborating evidence. Engate contends that testimonial evidence from multiple witnesses alone is never sufficient to invalidate a patent – that is, that testimonial evidence can never be corroborated by testimonial evidence. This view is not wholly unsupported by case law. The Federal Circuit has explained that "the Supreme Court has defined the necessity of corroboration not with reference to the level of interest of the testifying witness, but rather because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." *Finnigan Corp.*, 180 F.3d at 1368. But Engate's reading of Federal Circuit precedent overstates the level of skepticism with which courts must regard testimonial evidence when considering the validity of a patent. The year before the Federal Circuit decided *Finnigan*, it implicitly accepted that testimonial evidence can satisfy the corroboration requirement under certain circumstances, *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998), and it has stated as recently as last month that the "oral testimony of a disinterested party can serve to satisfy the corroboration requirement." *TypeRight Keyboard Corp.*, 374 F.3d at 1159. *See also Sandt v. Technology, Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed. Cir. 2001) (citing *Woodland Trust*, 148 F.3d at 1371).[4]

When assessing whether testimonial evidence corroborates other testimonial evidence,

---

[4] This construction of the corroboration requirement exemplifies, in this Court's view, the irrationality of the corroboration rule, which evidently applies at trials just as it applies on summary judgment. *See, e.g., Woodland Trust,* 148 F.3d at 1371-73. A single interested witness's testimony alone is insufficient, and the same is true of a single disinterested witness, but under *TypeRight Keyboard* evidently the whole is greater than the sum of its parts. We make this observation not to indicate any disagreement with *TypeRight Keyboard* but rather to suggest that the underlying rule has seen better days and ought to be put out of its misery humanely rather than being forced to suffer the death of a thousand cuts.

the court should consider

> (1) the relationship between the corroborating witness and the alleged prior user,
> (2) the time period between the event and trial,
> (3) the interest of the corroborating witness in the subject matter in suit,
> (4) contradiction or impeachment of the witness' testimony,
> (5) the extent and details of the corroborating testimony,
> (6) the witness' familiarity with the subject matter of the patented invention and the prior use,
> (7) probability that a prior use could occur considering the state of the art at the time,
> (8) impact of the invention on the industry, and the commercial value of its practice.

*Woodland Trust*, 148 F.3d at 1371 (quoting *Price v. Symsek*, 988 F.2d 1187, 1195 n.3 (Fed. Cir. 1993)). When the patentee comes forth with evidence challenging the credibility of the witnesses claiming prior use or invention, the trier of fact must implicitly make a credibility determination in finding that the testimony of one witnesses (or documents, for that matter) corroborates the testimony of the witness whose credibility has been challenged.

This has serious implications for the party seeking to invalidate a patent on summary judgment. A judge cannot make credibility determinations when reviewing a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus if the patentee comes forward with evidence sufficient to call into question the credibility of an affiant or deponent whose testimony is relied upon by the movant, the court cannot grant summary judgment as to invalidity, even if the party seeking the declaration of invalidity has come forth with corroborating testimonial or documentary evidence. The patentee must do more than simply "assert[] that the movants [sic] witnesses are not to be believed." *TypeRight Keyboard Corp.*, 374 F.3d at 1158. "However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movants [sic] witnesses." *Id.*

(citing *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628-29 (1944)).  Providing a basis

to believe the witness has an interest in the outcome of the litigation may be sufficient to create a

genuine issue of fact as to the witness's credibility.

With these standards in mind, the Court will evaluate each claim the defendants argue is

invalid to determine whether they are entitled to summary judgment.

### 1.   Claim 5 of U.S. Patent No. 5,740,245

Claim 5 of the '245 patent covers a transcription network for use by attorneys examining

witnesses, in which a CAT system translates the court reporter's strokes in real time to words and

numbers and sends the alphabetic and numeric transcript to computers loaded with software that

determines whether the transcript contains words previously selected by the user and performs a

pre-defined function once the words are located.[5]  The application for this patent was filed on

November 15, 1994, but the critical date for this patent – and all the other patents at issue – is

March 24, 1992, because Engate's patents are accorded the filing date of its first patent

---

[5] The Court's description in the body of the opinion of patented claims paraphrases the
claim language as understood and agreed to by the parties in light of the Court's previous
construction of the claims. *See* Defs.' Am. Facts; Engate's Resp. Facts.  Claim 5 of the '245
patent states exactly:

> 5.  A transcription network for use by attorneys in the examination of a
> witness comprising:
>> transcription means for generating transcript signals representative of spoken
>> words in real time;
>> a terminal capable of performing a predefined function;
>> the terminal receiving the transcript signals from the transcription means and
>> comprising evaluation means for evaluating the transcript signals as they
>> are received to determine whether the transcript signals contain a
>> predefined word selection;
>> the terminal responding to the evaluation means to perform the predefined
>> function.

Claim 5 of U.S. Patent No. 5,740,245 (issued April 14, 1998).

application, which was filed on March 24, 1993. *See* 35 U.S.C. § 120. An element essential to this claim – and all other claims the defendants seek to invalidate – is a CAT system that converts a stenographer's strokes into readable language in real time and transmits the transcript to computers used by attorneys. Articles describing these features in the early 1990s leave no doubt that this technology was available in courtrooms prior to March 24, 1992, the earliest critical date of any of Engate's patents. As quoted above, Diane Knox described how a CAT system works in a 1991 issue of The American Lawyer. Knox, *supra*, at 6. The year before, Martin Block wrote in the periodical Trial that:

> The court reporter's computer-aided transcription (CAT) system underlies and supports the CIC, integrating recent advances in computer technology. Ideally, computer terminals placed at the counsels' tables and the judge's bench can be tied into the court reporter's CAT system. This allows judges, lawyers, and litigants to see English-language text of testimony on their computer monitors moments after it is given.

Block, *supra*, at 51. Rather than repetitively recount that the CAT system that is the building block of all Engate's claims was in public use prior to the earliest critical date of Engate's patents, the Court adopts the above analysis as to these elements of Claim 5 of the '245 patent and applies it to our analysis of the validity of Engate's other patented claims.

The remaining elements of Claim 5 were also in public use prior to the critical date. Knox explained that "[a]ttorneys c[ould] also program the computer to automatically highlight certain words whenever they occur – court reporter Sanchez, for example, highlights the word *objection* in Judge Strand's file so he can easily find the questions or statements that prompt objections."[6] Knox, *supra*, at 9. Engate has failed to come forth with evidence raising a genuine

---

[6] The Court could have provided several citations in support of many of its statements describing the technology available in the computer-integrated courtrooms, but for brevity, we

(continued...)

issue of fact as to invalidity. The Court finds by clear and convincing evidence that each element of this claim was anticipated by the CICs in Chicago, Detroit and Phoenix.

Engate argues that the articles cited by the defendants and relied upon by the Court do not anticipate the claim because no one article describes all the elements of the claim. If the Court were concluding that Claim 5 is invalid because it was anticipated by a printed publication, Engate would be correct that the publication would have to include – either explicitly or inherently – every element of the claim. However, the basis for our conclusion that Claim 5 is invalid is that the technology described in the claim was in public use prior to the critical date. The Court cites the articles as evidentiary support for what technology was in use in the CICs, not as an independent ground for finding the claim invalid. The Court can rely on several sources to describe all the technological elements available in the courtrooms that – when used together – constituted functionalities claimed in Engate's patents.

2.    *Claim 7 of U.S. Patent No. 6,026,395*

Claim 7 of the '395 patent covers the capability to conduct natural language or Boolean logic searches on a real-time transcript while it is being generated.[7] The application for this

---

[6](...continued)
have limited our citations to one or two articles.

[7] Claim 7 of the '395 patent specifically states:

   7. A method performed by a computing system during a proceeding in which a transcript representative of spoken words is generated in real-time, the method comprising:
      generating a transcript in real time;
      storing the transcript;
      accepting, during generation of the transcript, a user input representative of a
         first search request;
      identifying at least a portion of the stored transcript corresponding to the first

                                                                              (continued...)

patent was filed on July 1, 1999. The defendants rely on two declarations to prove that searches

could be conducted while the transcript was being generated and that they could use Boolean

terms.[8] Brent Sandstrom, who developed the Discovery and DiscoveryZX software, explained:

> Searching a real-time transcript was available in DiscoveryZX prior to March 24, 1992. This real-time feature was inherited from the non-real-time version of the software. In real-time application, the court reporter generated a transcript, which was immediately sent to the judge's terminal and/or attorney's terminal, typically a PC or laptop, where it was displayed. The transcript was indexed in real-time. In different configurations, the real time transcript might be indexed stored either on a dedicated real-time convert workstation or on an attorney station that was running the convert software. . . . This index was used for various purposes, including responding to search requests. In use, a judge or an attorney would input a search request including search terms and optionally including Boolean logic. The system would identify one or more portions of either the real-time transcript or an earlier transcript corresponding to the search request. The software would display, as a court reporter continued to generate the real-time transcript, at least a portion of the real-time transcript that was responsive to the search request.

Sandstrom Decl. ¶ 12. Judge Strand's court reporter, Merilyn Sanchez, also explained in her

declaration that the technology in use prior to the critical date enabled Boolean logic searches of

the real-time transcript.

---

[7](...continued)
> search request; and
> displaying, during generation of the transcript, the at least a portion of the transcript identified.

Claim 7 of U.S. Patent No. 6,026,395 (issued Feb. 15, 2000).

[8] Searches sensitive to the relationship between search terms use Boolean logic. *A Primer in Boolean Logic*, University Libraries, University at Albany, *at* http://library.albany.edu/internet/boolean.html. "Boolean logic consists of three logical operators: or, and, not." *Id.* It enables the user to search for records that have either one term or another, both terms, or one term and not the other. *Id.* A more sophisticated variation enables searches using proximity connectors and the roots of words. *Boolean Searching*, Thurgood Marshall Law Library Research Guide, *at* http://www.law.umaryland.edu/marshall/UMLaw/researchguide/boolean.asp.

Prior to March 24, 1992, a search routine within the software could be initiated during a court proceeding, such that during the generation of the transcript, the user could search the transcript for a particular word or phrase. In real-time application, I generated a transcript which was immediately sent to the judge's terminal and/or attorney's terminal, typically a PC, where it was displayed and stored. (It also was stored by me on my CAT.) The judge or an attorney could input a search request including search terms and optionally including Boolean logic. Each user could independently search and identify one or more portions of the real-time transcript corresponding to the search request. The software would display (as I continued to generate the real-time transcript) at least a portion of the real-time transcript that was responsive to the search request.

Sanchez Decl. ¶ 9.

Engate argues the Court must deny the defendants' motion because two declarations are never sufficient to invalidate a patent. As we previously explained, this misstates the law. Applying the *Woodland Trust* factors, the Court must consider whether Sanchez's declaration corroborates Sandstrom's declaration. Sanchez, who served as Judge Strand's court reporter from 1986 to 1992 and remains a court reporter for the U.S. District Court in Phoenix, has no interest in the outcome of this litigation other than the fact that the defendants sought her testimony. She also has no relationship with Sandstrom other than a few conversations they had in 1989 when the Phoenix CIC used DiscoveryZX. Sandstrom Decl. ¶ 3. Yet their descriptions of the technological capabilities of litigation-support software are reinforcing. Although Sanchez's declaration recounts her activities more than ten years ago, she has an extensive familiarity with real-time court reporting and her declaration describes the capabilities of the Phoenix CIC with precision and detail. Furthermore, given the numerous technological capabilities of the Phoenix CIC, her testimony is consistent with the state of the art at the time. Therefore, the *Woodland Trust* test indicates Sanchez's declaration can be used as corroborative evidence.

However, as the developer of software with capabilities patented by Engate, Sandstrom has the type of interest in these proceedings that has given rise to the Federal Circuit's skepticism about testimonial evidence. *See Finnigan Corp.*, 180 F.3d at 1367. Under the Federal Circuit's corroboration requirement, neither Sanchez nor Sandstrom's declarations standing alone are sufficient to invalidate Engate's claim. But to rely on Sandstrom's declaration – even if in concert with the declaration of Sanchez, who is a very compelling source – would require the Court implicitly to make a credibility determination about Sandstrom. This the Court cannot do on a motion for summary judgment. For now, the Court is restricted by the confines of Fed. R. Civ. P. 56(c).

The defendants argue that Sandstrom's declaration is not the only evidence that corroborates Sanchez's declaration. It is true that several articles explained that users could search transcripts for terms. *See, e.g.*, Strand, *supra*, at 10-11; Knox, *supra*, at 9. But the articles do not explicitly state that users could search the real-time transcript. The defendants argue that is what the articles imply. Sanchez wrote in her 1990 article that litigation support software "enables the participants in the courtroom to electronically search the record for something that occurred five minutes or five days previously." Sanchez, *supra*, at 7. And B.J. Shorak wrote in 1989 that litigation support software "allows attorneys to review prior testimony on their monitors during cross-examination without having to interrupt the proceedings to ask the reporter to search through pages of notes. Instead, at the touch of a button, the computer finds the testimony in question and flashes it onto the monitor." B. J. Shorak, *Computer Courtrooms: Views of the National Shorthand Reporters Association*, the Advocate, October 1989, at 43 (Defs.' Ex. 11). Perhaps it would be reasonable to infer that any software that vitiates the need to

ask the court reporter to read back recent testimony must enable users to search the real-time transcript. But we cannot infer that the searching described in the articles used Boolean logic. The defendants argue that to anticipate, the articles need not mention Boolean searching, because the parties have agreed that Claim 7 is anticipated by any reference that allows for either natural language or Boolean searches. This is well and good, but there is nothing in the articles from which we can infer that the searches used natural language either; they just as easily could have involved simple scrolling back through the text until the user found what he or she was seeking. Because the articles fall short of describing every limitation of Claim 7, they neither corroborate all the portions of Sanchez's declaration necessary to entitle the defendants to summary judgment invalidating the patent, nor do they constitute anticipating printed publications.

The defendants argue that user manuals and promotional materials for the software programs DiscoveryZX and CaseView constitute printed publications that invalidate Claim 7. The 1989 user manual for DiscoveryZX version 3.0 explains how the user can search a document for a word, such as "insurance." Defs.' Ex. 4.1 at Introduction - 11. The defendants admit that version 3.0 alone did not have real-time capabilities, so the manual cannot anticipate Claim 7. But the defendants argue DiscoveryZX version 3.1 had real-time capabilities; the version 3.1 manual incorporates by reference all the functions, such as searching, described in the version 3.0 manual. The defendants' argument is based on a passage in the version 3.1 manual, which states: "If you have never used DiscoveryZX before, we suggest you go through the main DiscoveryZX tutorial using the program's demonstration transcripts. These instructions assume you are already comfortable with the DiscoveryZX program." Defs.' Ex. 4.4 at 25. The Court does not believe this passage is sufficient for us to conclude that the version 3.1 manual describes all the

limitations of Claim 7. The defendants make the alternative argument that the version 3.1 manual invalidates because it states that the transcript can be searched. *Id.* at 18. But the version 3.1 manual does not state that the user can conduct a natural language or Boolean search, so it does not describe all the limitations of Claim 7. Furthermore, Engate has raised a genuine issue as to whether the version 3.1 manual was actually published.

The defendants argue that DiscoveryZX version 3.1 is invalidating prior art, because Sandstrom states that version 3.1 had all the capabilities of version 3.0, which we know from the manual allowed natural language searches. Sandstrom Decl. ¶ 8. But as we have already discussed, Sandstrom's declaration is insufficient for purposes of summary judgment.

The defendants' argument regarding CaseView suffers from a similar infirmity. The defendants have provided the Court with a DVD containing a promotional video circulated by Stenograph, the makers of CaseView. In describing CaseView's capabilities, the narrator states that an attorney can "search for a pertinent word or phrase or previously marked text" in a real-time transcript. Defs.' Ex. 3.2. One could infer that a search for a pertinent word uses natural language. But for CaseView to anticipate Claim 7, it must have been in use or on sale prior to March 24, 1992. The last frame of the video says only that the video was copyrighted in 1992 but does not provide a more precise date. John Wenclawski, the president of Stenograph who provided the defendants with the video, states in a declaration that the video was in use prior to March 24, 1992. But we cannot rely on Wenclawski's declaration to give the defendants summary judgment, because as the president of a company that markets a product that might be covered by Engate's patents, he is an interested witness. For these reasons, the Court denies the defendants' request for summary judgment on the invalidity of Claim 7 of the '395 patent.

3. *Claims 4 and 8 of U.S. Patent No. 5,884,256*

Claims 4 and 8 of the '256 patent cover a computer interface that enables the user to annotate portions of the text with supplemental information related to the selected portion of the text as it is being delivered in realtime to the user's computer from the CAT system.[9] The application for Patent 5,884,256 was filed on April 9, 1998. The software available in Judge Strand's CIC "permit[ted] the judge and the lawyers to insert notes of their own in the testimony as it unfolds and to program the computer to high-light any key words which they expect to figure in the trial." Strand, *supra*, at 11. These notes could be interspersed through the testimony or indexed to the relevant portions of the text. Knox, *supra*, at 9. Engate has failed to come forward with evidence creating a genuine issue of fact as to whether the software capabilities available in CICs anticipated their patent claims. Accordingly, the Court grants the defendants summary judgment as to the invalidity of Claims 4 and 8 of the '256 patent.

4. *Claim 10 of U.S. Patent No. 5,884,256*

---

[9] Both Claims 4 and 8 relate back to Claim 1 of the '256 patent, which states

> 1. A transcription network utilized during a testimonial proceeding by a user, the transcription network comprising:
> an attorney terminal having a user interface;
> a stenograph system that converts spoken words to text and delivers the text to the attorney terminal for real time display; and
> the user interface of the attorney terminal enabling the user to select portions of the delivered text and associate supplemental information with each of the selected portions during the testimonial proceeding.

Claim 1 of U.S. Patent No. 5,884,256 (issued March 16, 1999). Claim 4 states "[t]he transcription network of claim 1 wherein the supplemental information comprises a note that annotates a selected portion of the delivered text." Claim 4 of U.S. Patent No. 5,884,256 (issued March 16, 1999). Claim 8 states "[t]he transcription network of claim 1 wherein the supplemental information *comprises* a message relating to a selected portion of the delivered text." Claim 8 of U.S. Patent No. 5,884,256 (issued March 16, 1999).

Claim 10 of the '256 patent claims "[t]he transcription network of claim 1 wherein the user interface of the attorney terminal enables a user to sequentially review the selected portions by skipping at least part of unselected portions of the delivered text." Claim 10 of U.S. Patent No. 5,884,256 (issued March 16, 1999). The defendants rely on two declarations for their assertion that software enabled users to skip over portions of unselected text prior to the critical date. Sandstrom's declaration states that "[a]s a real-time transcript was received, the DiscoveryZX user interface allowed the user to search the transcript and select portions of the transcript. The selected portions might have supplemental information associated with them. The user could jump from one selected portion of the text to the next, skipping unselected portions." Sandstrom Decl. ¶ 15. Sanchez similarly states that

> [p]rior to March 24, 1992, users could review selected portions of the real-time transcript by skipping at least part of unselected portions of the transcript. As a real-time transcript was received, the software in the workstations allowed the user to search the transcript and select portions of the transcript, and to either have or not have supplemental information associated with it. The user could jump from one selected portion of the text to the next, skipping unselected portions.

Sanchez Decl. ¶ 11. The search function described by Sandstrom and Sanchez is on all fours with Claim 8 of Engate's patent. But as we previously discussed, if we relied on Sandstrom's declaration to corroborate Sanchez's, we would have to make a determination of Sandstrom's credibility, which we cannot do on summary judgment.

But that does not end our inquiry. Sandstrom offered documentary evidence to substantiate his claims about the pre-critical date capabilities of the DiscoveryZX software. Although we cannot rely on Sandstrom's declaration even if it is corroborated, we can consider whether this documentary evidence alone meets the clear and convincing standard of proof to

invalidate a patent.[10] A "Quick Reference Card" for DiscoveryZX prepared by the Texas Court Reporters Association for a presentation about CICs on April 27, 1991 at the NCRA Midyear Seminar explains that the F1 and F2 keys on the keyboard enable the user to "Go to Next Keyword" and "Go to Next Master Keyword." Defs.' Ex. 4.5. The Quick Reference Card was prepared for a session called "Realtime Spectacular, Part 3," thus one can infer that the F1 and F2 functions could be utilized on a realtime transcript. *Id.* Engate argues that there is no evidence that the version of DiscoveryZX that had this capability had been installed in any CICs before the critical date. Although Engate is correct that no descriptions of the pre-critical date CICs specifically mentioned DiscoveryZX software with this feature, the reference card shows that the version of DiscoveryZX that had the function at issue was *on sale* prior to the critical date, which is a basis for invalidity under 35 U.S.C. § 102(b). The Court finds the Quick Reference Card provide clear and convincing evidence of invalidity that Engate has failed to call into question. Accordingly, the Court grants the defendants' motion for summary judgment as to Claim 10 of the '256 patent.

    5.    *Claim 15 of U.S. Patent No. 5,940,800*

Claim 15 of the '800 patent describes a system that enables the user to create a list of

---

[10] The documentary evidence pertains to the capabilities of DiscoveryZX software. Because Sanchez did not state that she used the search-and-skip function of DiscoveryZX software, the documentary evidence does not provide the corroboration that the Federal Circuit requires for us to be able to rely on the testimonial evidence of a disinterested witness such as Sanchez. A fact finder might, after a trial, find the totality of the evidence (testimony and documents) on this and other points sufficient to satisfy the Federal Circuit's corroboration requirement as we understand it. But on a summary judgment motion, a judge cannot make the credibility determinations that we believe are necessary to get the defendants over the hurdle in this case.

issues and choose which issues she wants the system to identify in the transcript.[11] The application for Patent 5,940,800 was filed on August 31, 1998. The technology available in CICs in the 1980s and early 1990s enabled users to create a list of issues that would be identified in the transcript as it was forwarded to the user's computer from the CAT system. As we mentioned above, in the Chicago, Detroit and Phoenix CICs "attorneys c[ould] 'issue-code' their copies of the testimony as it happens, by assigning numbers to subjects of particular interest and marking the transcript electronically whenever the subject is mentioned." Knox, *supra*, at 8-9. Engate has failed to create a genuine issue of fact about the issue-coding functionality available in the CICs. Accordingly, the Court holds that Claim 15 was anticipated by the CICs and is invalid under 35 U.S.C. § 102(b).

6. *Claim 1 of U.S. Patent 5,369,704*

Claim 1 of the '704 patent covers the transmission of a real-time transcript from a CAT system to User 1's computer and User 2's computer, which is networked to User 1's computer and, therefore, able to send messages associated to selected parts of the transcript to User 1's

---

[11] Specifically, Claim 15 of the '800 patent states:

15. A method used during a transcription proceeding for categorizing transcript text, the method utilizing at least a stenographic system, a screen, and a user input device, the method comprising:
converting, using the stenographic system, representations of spoken words to transcript text in real time;
displaying the transcript text on the screen for real time review;
displaying on the screen a list of issue categories;
accepting, via the user input device, an input selecting at least one issue category from the list of issue categories; and
associating at least a portion of the transcript text with the selected at least one issue category.

Claim 15 of U.S. Patent No. 5,940,800 (issued Aug. 17, 1999).

computer that can be displayed on that computer with the sections of the transcript associated to the message.[12] The application for Patent 5,369,704 was filed on March 24, 1993. Articles discussing the technology in public use in CICs describe many of the elements comprising Claim 1. For example, the articles state that real-time transcripts could be sent to multiple computers linked to a CAT system in the CICs prior to the critical date. Knox, *supra*, at 4. The LAN network in the Phoenix CIC "electronically link[ed] a number of otherwise separate personal computer work stations together so they can communicate with each other and so they can share one central data base that is created and maintained on a specific item of computer hardware called a 'file server.'" Strand, *supra*, at 10. Users on the network could definitely send messages to each other using electronic mail or ABA/Net. Madden, *supra*, at 14; Knox, *supra*, at 8.

However, one element of Claim 1 is missing from the articles describing the CICs. No articles state – either explicitly or implicitly – that one user on the network could send a message

---

[12] More specifically, Claim 1 of the '704 patent covers:

1. A transcription network comprising:
transcription means for generating transcript signals representative of spoken
    words in real time;
an attorney's terminal receiving the transcript signals generated by said
    transcription means for display;
an associate's terminal receiving the transcript signals generated by said
    transcription means for display;
said associate's terminal providing for the generation of messages to be
    transmitted to said attorney's terminal, and, prior to transmissions,
    providing for the association of the generated messages with selected
    portions of the transcript signals; and
said attorney's terminal providing for the display of the selected portions of the
    transcript signals through access to the associated messages received from
    said associate's terminal.

Claim 1 of U.S. Patent No. 5,369,704 (issued Nov. 29, 1994).

31

*associated to a selected portion of the transcript* to a second user on the network and that the

second user could see the *portions of the transcript associated* to the message. The defendants'

only evidence that portions of the real-time transcript could be linked to messages prior to the

critical date is Sanchez's declaration. Although the Court has absolutely no reason to doubt

Sanchez's veracity and credibility, as previously discussed, we cannot invalidate a patent based

on uncorroborated testimonial evidence, even if the witness is not interested in the outcome of

the case. *Finnigan Corp.*, 180 F.3d at 1367. Accordingly, the Court must deny the defendants'

motion for summary judgment as to Claim 1 of Patent 5,269,704.

     7.    *Claim 16 of U.S. Patent No. 5,369,704*

Claim 16 of the '704 patent covers a network configuration in which the CAT system

transmits real-time transcripts to several computers used by plaintiff's attorneys and several

computers used by defense attorneys, but the communication link between the defense attorneys'

computers are isolated from the communication link between the plaintiff attorneys' computer

such that each side can send private messages to other members of her side.[13]  As we have

---

[13] Specifically, Claim 16 of the '704 patent covers:

    16. A transcription network comprising:
transcription means for producing transcript signals representative of spoken
    words in real time;
a plurality of examining terminals receiving and displaying transcript signals
    produced by said transcription means;
a first communication link connected to provide for the exchange of messages
    between said examining terminals;
a plurality of defending terminals receiving and displaying transcript signals
    produced by said transcription means; and
a second communication link isolated from said first communication link and
    connected to provide for the exchange of messages between said
    defending terminals.

(continued...)

32

previously explained, the CAT system utilized in the Phoenix CIC transmitted real-time

transcripts to multiple computers within the courtroom that were linked together using a local

area network. Strand, *supra*, at 10. The computers were "located on the judge's bench, at each

counsel's table, and at the courtroom deputy clerk's station, the court reporter's position, the

secretary's desk, and each law clerk's desk." *Id.* To ensure that each party and the judge's files

remained confidential, each party and the court were provided with their own space on the

database protected by security codes. *Id.* at 11. ABA/Net was available on the computers, which

enabled users to email from their workstations. *Id.* at 47-48.

The Court would have to take too large of an inferential step to conclude that these

elements comprise the transcription and communication network described in Claim 16. Judge

Strand explained that one computer terminal was provided for each party. Claim 16 envisions a

set-up in which each party has at least two computer terminals that receive the real-time

transcript from the CAT system. The defendants rely on an article and a declaration to argue that

more than one computer could have been added to the network for each party. First, the

defendants cite an article written by Judge Frank Andrews and published in September 1992

describing the technology available in a CIC in Dallas. The article explained that computers in

the Dallas CIC

> are located at each counsel table, at the bench, and at the reporter's workstation.
> Each computer is part of a local area network (LAN) that makes the court
> reporter's trial transcript immediately available for review. (Though linked
> together through the LAN, each computer can function independently of the
> others. The LAN can be expanded to accommodate additional users as
> necessary.)

---

[13](...continued)
Claim 16 of U.S. Patent No. 5,369,704 (issued Nov. 29, 1994).

Frank Andrews, *Computer-Integrated Courtrooms: Enhancing Advocacy*, Trial, September 1992, at 37-38. Engate correctly points out that the article was published after the critical date and gives no indication that the Dallas CIC was in use prior to the critical date. Therefore, we cannot say that the technology available in the Dallas CIC, as described by Judge Andrews, anticipated Claim 16 of Engate's patent.

The defendants' only other support for their claim that multiple computers could be attached to the network for each party is the Sanchez declaration, which states:

> Prior to March 24, 1992, users could send messages to other users, which could include part of the real-time transcript. The Phoenix CIC utilized a Novell local area network linking ten DOS 286 workstations. The work stations were located on the judge's bench, at each counsel's table, at the courtroom deputy clerk's station, at my position, in the judge's chambers, in my office, at the secretary's desk, and at each law clerk's desk. Those work stations also each had the capability to send and receive messages to and from any other work station. Those messages could include part of the transcript. The Judge and clerk could communicate via e-mail. This communication from the clerk to the judge was isolated from counsel. A single plaintiff attorney terminal was connected to the Novel[l] network. Because the CIC was configured with double cabling at each work station, a second terminal could have been provided to the plaintiff, if requested. Similarly, a second terminal could have been provided to the defendant, if requested. These second terminals would have allowed the two plaintiff terminals and the two defendant terminals to communicate in the same manner as the clerk and Judge.

Sanchez Decl. ¶ 13. As we have previously stated, Sanchez's credibility is not in issue because she is uninterested in these proceedings and Engate has not challenged her credibility, but we cannot invalidate a claim based solely on uncorroborated testimonial evidence. The Court suspects that multiple computers for each party could have been attached to the network prior to the critical date, but we cannot say the technology we know was available in the Phoenix CIC inherently had this capability. Similarly, even though the computers in the Phoenix CICs were password protected to maintain confidentiality and had access to e-mail, it is not inherent in this

set-up that courtroom technology provided isolated communication links between the multiple computers for each party such that a secure communication could be sent between two computers used by one party in the courtroom. Therefore, the defendants have failed to show that the technology available in the Phoenix CIC prior to the critical date of Patent 5,369,704 anticipated Claim 16. The Court denies the defendants' motion for summary judgment as to this claim.

    8.    *Claims 26 -28 and 32 of U.S. Patent No. 5,949,952*

Claim 26 of the '952 patent covers a real-time system that converts spoken words to text that is transmitted to user computers and captures a video image as the words are being spoken that is associated with the text in real time.[14] Claim 27 covers the additional feature that a portion of the video images captured under Claim 26 can be delivered to the terminal.[15] Claim 28 covers the ability to view the video images and transcript simultaneously on the screen.[16]

---

[14] Specifically, Claim 26 of the '952 patent covers:

    26. A method for facilitating the use of information from a testimonial proceeding, the method utilized at least in part during the testimonial proceeding, the method using a transcription system, a capture system and a terminal having a screen, the method comprising:
        converting, using the transcription system, spoken words to text in real time;
        capturing, using the capture system, video images showing speaking of the
            spoken words in real time;
        associating the video images with the text;
        delivering the text to the terminal; and
        displaying the text on the screen for real time review.

Claim 26 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

[15] Specifically, Claim 27 covers "[t]he method of claim 26 further comprising: delivering at least portions of the video images to the terminal; and displaying at least portions of the video images delivered." Claim 27 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

[16] Specifically, Claim 28 covers "[t]he method of claim 27 wherein the displaying of the at least portions of the video images delivered occurs on the screen along with the displaying of
                  (continued...)

Claim 32 covers the association of a real-time transcript with video images of the speaker with the added features that the transcript can be displayed in real time on a terminal, the CAT system can store the transcript with the associated video images, and a user can use the CAT system to search for stored text and display it on the screen with the associated video images.[17] The application for this patent was filed March 12, 1997.

The defendants argue that Claims 26 through 28 were anticipated by closed captioning of television programming. By the early 1990s, the National Captioning Institute used a CAT system to translate stenographic strokes to readable text that was associated with a broadcast signal and transmitted so that the text could be viewed on a screen receiving the signal along with the video image of the speaker. Wolffe, *supra*; *see also* Foerstel, *supra* ("The captions are then transmitted with the televised picture and appear at the bottom of the screen."). Engate's sole response is that closed captioning performed by the NCI was displayed on television screens not computer screens. We find the distinction between a television screen and a computer screen immaterial to the substance of the patent. Thus Engate has failed to raise a genuine issue of fact as to the validity of claims 26 through 28. The advent of closed captioning in the 1980s

---

[16](...continued)
the text." Claim 28 of U.S. Patent No. 5,949,952 (issued Sept. 7, 1999).

[17] Claim 32 specifically states:

> 32. The method of claim 26 further comprising:
> storing the text and the associated video images;
> accepting an input and performing a search of the stored text using the
> accepted input; and
> displaying portions of the stored video images corresponding to portions of the
> stored text located in response to the search.

Claim 32 of U.S. Patent 5,949,952 (issued Sept. 7, 1999).

anticipated Claims 26, 27 and 28 of the '952 patent.

The defendants argue that Claim 32 was anticipated by the DiscoveryVideo ZX2 software first offered for sale on April 12, 1991. Press Release, Stenograph Legal Services Unveils New Litigation Support Product, Stenograph Corp. (April 12, 1991) (Defs.' Ex. 7.1). According to the press release:

> DiscoveryVideoZX instantly translates a court reporter's machine-written phonetic shorthand transcription of live oral testimony (which may be in the English, Spanish, German, French, Italian, Portuguese, Arabic, or Korean language) into text, while simultaneously synchronizing live or pre-recorded audio and video recordings on video tape. Once the text or transcript has been edited by the court reporter, the data is converted into DiscoveryZX format for use within SLS's full-text retrieval software.
>
> Full-text retrieval enables a user to free-form search and retrieve any word or string of words from a textual database or large document. A user, such as a judge or attorney, may view the entire translated transcript consisting of a number of large textual databases and video recorded sessions or select a particular segment for viewing. By a single keyboard command, the full-text retrieval software prompts the user to mount the correct video tape in the VCR and the tape, once verified, immediately searches for the corresponding video and audio segment.
>
> Playback of the video is accomplished in one of two ways. The DiscoveryVideoZX program runs on a standard MS-DOS-based computer that is connected to a NEC PC-VCR via an RS-232 serial cable. Once the video segment is located, the video can be played back via a standard television or video monitor or directly within the VGA monitor attached to the PC by use of a full-motion video card located within the PC. If a full-motion video card is employed, the user may view simultaneously full-motion video and the text where the search originated. Full VCR control is provided for playback, pausing, fast-forwarding, rewinding, and other VCR commands. The full-motion video card also allows for multiple image sizes, including full-screen, 1/4 screen and 1/16 screen. Additionally, one or more external video monitors may be connected if the video will be used within a courtroom. This option allows monitors to be positioned for the judge, attorneys, and jury for viewing convenience.

*Id.*

Engate argues that the DiscoveryVideoZX software did not anticipate Claim 32 because it did not actually have the capability to synchronize the transcript and video in real time as the

transcript was being created and the video recorded. In support of its position, Engate refers to the deposition testimony of Fred Middlebrooks, a Stenograph employee, in which he stated that DiscoveryVideoZX could not synchronize video to the transcript until the transcript had been completed. Middlebrooks Dep. at 17 (Pl.'s Ex. L). Claim 32 does not state that the user must be able to search for text and the associated video image in real time. However, Claim 32 incorporates Claim 26, so the video images must be synchronized to the transcript in real time to meet all the elements of Claim 32. Even though we found Claim 26 was anticipated by closed captioning, we cannot conclude on the present record that the first few elements of Claim 32 were anticipated by closed captioning and the searching and playback elements were anticipated by DiscoveryVideoZX. There is no indication that DiscoveryVideoZX was utilized with closed captioning, and for a prior use to anticipate a claim, all the elements of the claim must have been in use together as described in the claim. *Apple Computer*, 234 F.3d at 20. Middlebrooks' deposition testimony creates a genuine issue of fact as to whether DiscoveryVideoZX invalidates Claim 32 as prior art.

The defendants argue that regardless of whether DiscoveryVideoZX had the features described in the press release, the press release itself constitutes a printed publication that invalidates Claim 32. Engate responds that the press release is ambiguous as to whether the transcript and video are synchronized in real time. Although one reasonable interpretation of the press release is that the software described therein could synchronize video images to the text in real time, we agree with Engate that other interpretations of the press release are reasonable. Accordingly, the press release alone cannot invalidate Claim 32 of Engate's patent as a prior printed publication.

The defendants also argue that by 1992, the technology described in Claim 32 was in use in the Dallas CIC. The court reporter in the Dallas courtroom used a CAT system to translate "the reporter's phonetic stenographic notes into readable English text . . . instantaneously." Andrews, *supra*, at 37.

> To supplement the record being produced by the court reporter's real-time translation, a camera installed in our courtroom videotapes witnesses as needed. When testimony is conducted through an interpreter, a videotape is made in case the accuracy of the translation is questioned later. With the consent of all parties, other witnesses can be videotaped for playback (just as testimony could be read back) in the event the witnesses are not available should there by a retrial.
> The real-time transcript is encoded with time signals by the computer. The videotape is automatically encoded with the same signals. Once the user has performed a search for a word or phrase on the transcript, the computer can then use the signals to locate that testimony quickly on the videotape. On a 4-hour videotape it takes under 2 minutes. This search capability is invaluable in editing videotaped depositions, and it is a tremendous time-saver if a jury requests that part of the testimony be read back. The testimony in question can be quickly located and played back on a courtroom monitor.

*Id.* at 38. Engate argues that because Andrews' article describing the Dallas CIC was published in September 1992, the technology it describes did not anticipate Claim 32. Engate is correct that we cannot assume that the technology described by Judge Andrews was available prior to March 24, 1992. Therefore, the Court must deny the defendants' motion for summary judgment on Claim 32. In summary, the Court grants the defendants' motion for summary judgment as to Claims 26, 27 and 28 but denies it as to Claim 32 of Patent 5,949,952.

9.    *Claims 12, 13, 19 and 25 of U.S. Patent No. 6,282,510*

Claim 12 of the '510 patent covers the creation of a real-time transcript that is linked in real time to an audio recording of the speaker and can be stored in the transcription system, displayed on a screen, and searched so that the audio recording associated with the part of the

transcript responsive to the search can be played.[18]  Claim 13 covers resynchronizing the

transcript and corresponding audio signals captured using the system described in Claim 12.[19]

Claim 19 of the patent covers the use of a CAT system to create a transcript in real time that is

delivered to and displayed on a terminal and is linked in real time to audio recordings of the

spoken words corresponding to the transcript.[20]  Claim 25 of the patent covers a function that

---

[18] Specifically, Claim 12 of the '510 patent covers:

   12.  A method for facilitating the use of information from a testimonial
proceeding, the method utilized at least in part during the testimonial proceeding,
the method using a transcription system, a capture system and a terminal having a
screen, the method comprising:
      converting, using the transcription system, spoken words to text in real time;
      capturing, using the capture system, audio signals representative of the spoken
         words in real time;
      associating the audio signals with the text;
      storing the text and the associated audio signals;
      displaying the text on the screen for real time review;
      accepting an input and performing a search of the stored text using the
         accepted input; and
      reproducing portions of the spoken words from portions of the stored audio
         signals corresponding to portions of the stored text located in response to
         the search.

Claim 12 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

[19] Claim 13 of the '510 patent specifically states that "[t]he method of claim 12 further
comprising reassociating the audio signals with the text to attempt to provide accurate
synchronization therebetween." Claim 13 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

[20] Claim 19 of the '510 patent specifically states:

   19.  A method for facilitating the use of information from a testimonial
proceeding, the method utilized at least in part during the testimonial proceeding,
the method using a transcription system, a capture system and a terminal having a
screen, the method comprising:
      converting, using the transcription system, spoken words to text in real time;
      capturing, using the capture system, audio signals representative of the spoken
         words in real time;

(continued...)

allows the user to search the transcript and associated audio files created according to Claim 19 and play the audio files associated with the portion of the transcript responsive to the search.[21] The application for Patent 6,282,510 was filed on February 3, 2000.

The defendants argue that these four claims were anticipated by DiscoveryVideoZX. They rely on the press release describing DiscoveryVideoZX's capabilities. However, neither the DiscoveryVideoZX software nor the press release can be the basis for invalidating Claims 12,13, 19 and 25 of Patent 6,282,510 for the same reasons that it could not be used to invalidate Claim 32 of Patent 5,949,952 – that is, Engate has created a genuine issue of fact as to whether the DiscoveryVideoZX software could link a transcript to an audio or video file in real time and the press release is too ambiguous to constitute a prior printed publication describing all the claim limitations. Even though Middlebrooks' deposition testimony only mentioned that DiscoveryVideoZX could not synchronize *video* files with the text until after the transcript was

---

[20](...continued)
> associating the audio signals with the text;
> delivering the text to the terminal; and
> displaying the text on the screen for real time review.

Claim 19 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

[21] More precisely, Claim 25 of the '510 patent states:

> 25. The method of claim 19 further comprising:
> storing the text and the associated audio signals;
> accepting an input and performing a search of the stored text using the
>     accepted input; and
> reproducing portions of the spoken words from portions of the stored audio
>     signals corresponding to portions of the stored text located in response to
>     the search.

Claim 25 of U.S. Patent No. 6,282,510 (issued Aug. 28, 2001).

completed and did not mention when audio files were synchronized with the text, one can reasonably infer that the synchronization process was the same for both audio and video files, as the press release on which the defendants relied equated the two functions.

The defendants herald two other pieces of evidence as invalidating Claims 12, 13, 19 and 25 of the '510 patent. They claim that a brochure and user manual for DiscoveryVideoZX describe every limitation of the claims and, therefore, are invalidating prior printed publications. The brochure explains that: "As the court reporter takes down testimony, the spoken information is electronically synchronized with the videotape. The videotaped testimony can then be searched by keyword or phrase, which allows you to not only see what was said, but also how the person said it. " Defs.' Ex. 7.3. However, the brochure does not carry a date. The sole source for the date of the brochure is the declaration of Richard Stirewalt, owner of a court reporting and litigation support company, who states that his firm received the brochure prior to March 24, 1992. Stirewalt Decl. ¶ 4. Both parties agreed (at oral argument on defendants' motion to reconsider) that under the Court's understanding of the corroboration requirement, the Court cannot rely on Stirewalt's testimony about the vintage of the brochure unless it is corroborated. Because the defendants have not corroborated Stirewalt's claim about the brochure, we cannot assume the brochure was printed or published prior to the critical date and, therefore, it does not constitute an invalidating prior printed publication.

The DiscoveryVideoZX user manual was copyrighted in 1991. It explains how once the stenographer begins writing steno, "[t]he translated steno appears almost immediately on the OZpc system. VideoZX creates a Video Index File, automatically synchronizing the video tape information with the steno." Defs.' Ex. 7.7 at 23. An earlier section of the manual states that the

software "enables the attorney to view the transcript text and to do a full text search and retrieval while the video tape shows the person giving the testimony." *Id.* at 1. But the portions of the user manual cited by the defendants do not say the text of the transcript can be displayed for real-time review, one of the limitations of Claims 12, 13, 19 and 25. Because the DiscoveryVideoZX user manual does not describe all the limitations of the claims, it is not an invalidating prior printed publication. Accordingly, the Court denies the defendants' motion for summary judgment as to Claims 12, 13, 19 and 25 of the '510 patent.

10.      *Claim 1 of U.S. Patent No. 5,815,639 & Claim 4 of U.S. Patent No. 5,926,787*

Claim 1 of the '639 patent and Claim 4 of the '787 patent cover a CAT system comprising a library of key strokes and their corresponding alphabetic and numeric translations or pronounceable syllables that the CAT system uses to translate the stenographer's keystrokes into exact words in real time or, if there is no exact word in the dictionary that matches the keystrokes, into phonetic syllables stored in the library.[22] The application for Patent 5,815,639

---

[22] Claim 1 of the '639 patent specifically states:

1. A reporting system for providing in real-time to a viewing terminal text representative of spoken words that is readable by a lay person, said reporting system operates on coded representations of spoken words in a first phoneme formal generated in real time, said reporting system comprising:
     a cross-reference library storing associations between coded representations of spoken words in the first phoneme format and corresponding exact alphabetic and numeric text;
     a phoneme library for storing associations between coded representations of spoken words in the first phoneme format and pronounceable but not exact representations of spoken words in a second phoneme format;
     a transcriber retrieving from said cross-reference library exact alphabetic and numeric text for coded representations of spoken words in the first phoneme format that have associations stored in said cross-reference library;
     said transcriber retrieving from said phoneme library coded representations of
                                                         (continued...)

was filed on May 20, 1993, and the application for Patent 5,926,787 was filed on August 31, 1998.

The defendants rely on two declarations to support their argument of anticipation. A Stenograph employee stated in his declaration that

> [p]rior to March 24, 1992, there were CAT systems in use in this country in which the CAT system contained both phonetic and regular dictionaries. In particular, I had worked with such a CAT system, the OmniCat system. The OmniCat system had both a main dictionary and user programmable job dictionaries, which contained direct translations of keystrokes. In addition to these dictionaries, it also contained an additional dictionary which contained phonetic representations of letters and syllables. The CAT system compared the stenographic strokes to the words stored in the dictionaries. If it located an exact match, the located word was entered into the transcript. If the CAT system could not locate an exact word in the user dictionaries, it would then compare the stenographic characters to the

---

[22](...continued)
> spoken words in the second phoneme format that are pronounceable by a lay person using coded representations of spoken words in the first phoneme format for which said cross-reference library stores no associations; and
>
> communication means for delivering both the exact alphabetic and numeric text and the coded representations of spoken words in the second phoneme format to the viewing terminal for display.

Claim 1 of U.S. Patent No. 5,815,639 (issued Sept. 29, 1998).

Similarly, Claim 4 of the '787 patent specifically claims that "[t]he reporting system of claim 1 wherein said processing system utilizes a phoneme library to identify the substitute text." Claim 4 of U.S. Patent No. 5,926,787 (issued July 20, 1999). And Claim 1, on which Claim 4 depends, states:

> 1. A reporting system used by at least a lay person, the reporting system comprising: a screen;
>
> a processing system that attempts to identify exact textual representations for words spoken in real time;
>
> said processing system identifying substitute text for those of the words spoken that the processing system fails to identify exact textual representations; and
>
> said processing system directing display of the exact textual representations and the substitute text on the screen.

Claim 1 of U.S. Patent No. 5,926,787 (issued July 20, 1999).

stenographic characters stored in the phonetic library and create a phonetic representation of the untranslated word which would then go into the real-time transcript.

Middlebrooks Decl. ¶ 4. Similarly, Sanchez explained in her declaration that

> The CAT system I used in the Phoenix CIC, prior to March 24, 1992, contained a main dictionary and several user programmable job dictionaries. In addition to these dictionaries, it also contained an additional dictionary which contained phonetic representations of letters and syllables. The CAT system compared the stenographic strokes to the words stored in the dictionaries. If it located an exact match, the located word was entered into the transcript. If the CAT system could not locate an exact word in the user dictionaries, it would then compare the stenographic characters to the stenographic characters stored in the phonetic library and create a phonetic representation of the untranslated word; that phonetic representation would then go into the real-time transcript.

Sanchez Decl. ¶ 14. The technology as described by Sanchez and Middlebrooks contained all the elements that comprise Claim 1 and Claim 4 of Engate's patents. But as we have indicated before, we cannot rely on the testimony of an interested witness such as Middlebrooks to corroborate Sanchez's declaration because the Court would be making a credibility determination that is inappropriate on summary judgment.

The question, then, is whether the defendants have provided other evidence that satisfies the clear and convincing standard of proof. One piece of evidence is an article published in the Los Angeles Times in 1982 describing the use of a CAT system during the criminal trial of a deaf defendant. Bill Hazlett, *Computer Also on Trial in L.A. Courtroom*, L.A. Times, Feb. 19, 1982, at 3 (Defs.' Ex. 22). The computer system used in the L.A. courtroom was a CAT system developed by Xscribe Corp. *Id.* at 24. During the trial,

> [c]ourt reporter Jere L. With takes down the testimony on his electronic stenographic machine, which translates the words into a series of alphabetical outlines.
> . . .
> "Those outlines are then transmitted to a computer terminal which sorts

them out and matches them up with the corresponding English word," With said.
"Words the computer can't find, or can't recognize, are spelled out on the screens phonetically."

*Id.* at 3. The real-time transcript created by the system was transmitted to a "small television screen" on the defense table and judge's bench. *Id.* The article does not corroborate Sanchez's declaration because she did not state that she was using the Xscribe system described in the article. Engate argues that on its own, the article is insufficient to prove that the Dallas CIC anticipated its patents, because in the Dallas CIC, the transcript was delivered to a television screen rather than a computer terminal, and it is not clear from the article that the Xscribe software had a separate phoneme library. As we have said before, the Court finds it immaterial that the transcript was delivered to a television screen rather than a computer terminal; if the system could send the transcript to a television, it could send the output to a computer monitor. But the Court agrees with Engate's second challenge to the article because the only evidence that establishes that Xscribe's software utilized a separate phoneme library is dependent, in part, on Middlebrooks' declaration.

Middlebrooks stated in his declaration that the technology he described was available in both the OmniCat and Flexcap Cat systems. Middlebrooks Decl. ¶ 4. The Flexcap software was owned by Xscribe Corp., which provided the system used in Los Angeles. A Flexcap User's Manual attached to Middlebrooks' declaration explained that when the stenographer's strokes did not match any words in the software's library, they were "translated phonetically." Defs.' Ex. 27.2 at B3. Although the user manual does not refer to a phoneme "library," it lists the phonetic translations for corresponding stenographic strokes, in effect demonstrating that the software had a phoneme library. Because the copyright for the user's manual is 1992, Engate argues that it

46

does not necessarily constitute prior art because there is no evidence that a version of Flexcap

with the features described by Middlebrooks was in use prior March 24, 1992, the critical date.

Because the technology used in the L.A. courtroom in 1982 was an Xscribe system, the Court

could infer that the Flexcap capabilities listed in the user's manual, which mirrored those

described in the L.A. Times article, were available prior to the critical date. But this analysis

relies on Middlebrooks' declaration, which the Court cannot rely on because we cannot decide on

summary judgment that we find Middlebrooks to be credible, given that he is an employee of a

firm, Stenograph, that markets software that might be covered by Engate's patents. Accordingly,

the Court denies the defendants' motion for summary judgment as to Claim 1 of Patent

5,815,639 and Claim 4 of Patent 5,926,787.

*11. Claims 1 and 3 of U.S. Patent No. 6,023,675*

Claim 1 of the '675 patent covers the real-time digital recording of a testimonial

proceeding that is translated in real time by a CAT system into text that is delivered in real time

to a terminal located in a different place from where the words are spoken and transmitted from

the second location in real time to a terminal located in a third location, where the text is

displayed.[23] Claim 3 of the patent covers the audio recording of the testimonial proceeding that

---

[23] Claim 1 of the '675 patent specifically states:

1. A method utilized during a testimonial proceeding, the method comprising:
capturing representations of spoken words in real time at a first premises;
converting the representations into text in real time;
    delivering the text in real time to a remote system, the remote system being
        disposed at a second premises;
communicatively coupling at least one terminal and the remote system;
delivering, by the remote system, the text in real time to the at least one
        terminal, the at least one terminal being disposed at at least a third
        premises; and

(continued...)

is sent to a location away from where the testimony is occurring and then from that location to a third location.[24] The application for the '675 patent was filed on November 3, 1998.

The defendants argue that Claims 1 and 3 were anticipated by closed captioning because captions made using a CAT system were transmitted from NCI's offices to at least two locations. A United Press International article explained:

> [u]sing a stenotype machine, a real-time captioner "breaks" spoken words into phonetic strings. That information is sent electronically to a computer at NCI. The phonetic string is translated into words by computer and then the captioning information is sent back to the broadcast origin point where it merges with a regular broadcast signal and is transmitted. Decoder boxes, which cost about $200, "grab" the signal, translate the data into text and display the letters on the screen along with the picture.
> There is only a three- to five-second delay from the time something is spoken "live" on television to having it translated into a caption and sent to the home of a hearing-impaired person, [NCI manager of public relations Morgan] Bramblet said.

Wolffe, *supra*. Engate argues closed captioning did not anticipate Claims 1 and 3 because the text and audio signals were displayed on a television screen rather than a computer terminal. We have already rejected this distinction as immaterial. Closed-captioning as described by Wolffe is

---

[23](...continued)
>  displaying at the at least one terminal the delivered text for real time review.

Claim 1 of U.S. Patent No. 6,023,675 (issued Feb. 8, 2000).

[24] Claim 3 of the '675 patent specifically states:

> 3. The method of claim 1 further comprising:
> capturing audio signals corresponding to the spoken words;
> delivering the captured audio signals to the at least one terminal via the remote system; and
> reproducing at the at least one terminal the delivered audio signals.

Claim 3 of U.S. Patent No. 6,023,675 (issued Feb. 8, 2000).

composed of the elements comprising Claims 1 and 3 of the '675 patent. Accordingly, the Court finds Claims 1 and 3 are invalid.

      *12.    Claims 4 and 6 of U.S. Patent No. 5,970,141*

      Claim 4 of the '141 patent covers a transcription network comprised of a CAT system that creates a real-time transcript and transmits it in real time to an attorney's terminal and a second terminal that is in a different location from the attorney's terminal, where the second terminal is linked to the attorney's terminal in such a way that messages associated with parts of the transcript can be sent from the second terminal to the attorney's terminal.[25] Claim 6 of the same patent adds a third terminal to the above configuration that is linked to the CAT system but not the attorney's terminal.[26] The application for the '141 patent was filed April 9, 1998.

      The defendants' argue Claims 4 and 6 were anticipated by the Phoenix CIC. They point

---

[25] Claim 4 of the '141 patent specifically claims that "[t]he transcription network of claim 1 wherein the messages are associated with protions of the text." Claim 4 of U.S. Patent No. 5,970,141 (issued Oct. 19, 1999). Claim 1 of the '141, on which Claim 4 depends, states:

> 1. A transcription network utilized during a testimonial proceeding, the transcription network comprising:
> an attorney terminal;
> a converter assisting in the conversion of spoken words to text;
> a remote terminal disposed at a location remote from the attorney terminal and the converter;
> the converter delivering the text to the attorney terminal and to the remote terminal for real time display; and
> the remote terminal supporting communication of messages regarding the real time display to the attorney terminal.

Claim 1 of U.S. Patent No. 5,970,141 (issued Oct. 19, 1999).

[26] Claim 6 of the '141 patent specifically covers "[t]he transcription network of claim 1 further comprising an additional terminal communicatively coupled to the converter but not communicatively coupled to attorney terminal." Claim 6 of U.S. Patent 5,970,141 (issued Oct. 19, 1999).

out that the Phoenix CIC used a Novell local area network to link work stations for the judge, court reporter, attorneys and judge's staff. Strand, *supra*, at 10. They further argue that because the computers in the courtroom had ABA/net, *id.* at 47-48, users could send messages to other users that included a part of the real-time transcript. Sanchez Decl. ¶ 13. But these features fall short of meeting all the elements of Claim 4 and 6. The defendants provide no evidence that the transcript could be transmitted by the CAT system in real time to a remote terminal. The defendants seem to imply that the attorney terminal could e-mail the real-time transcript to the remote terminal, but that is not equivalent to having the CAT system send the real-time transcript to the remote terminal.[27] Therefore, the Court denies the defendants' motion for summary judgment as to counts 4 and 6 of patent '141.

In summary, the Court grants the defendants' motion for summary judgment on their counterclaim of invalidity as to Claim 5 of U.S. Patent No. 5,740,245; Claims 4, 8 and 10 of U.S. Patent No. 5,884,256; Claim 15 of U.S. Patent No. 5,940,800; Claims 26, 27 and 28 of U.S. Patent No. 5,949,952; and Claims 1 and 3 of U.S. Patent No. 6,023,675. The Court denies the defendants' motion for summary judgment on Claims 1 and 16 of U.S. Patent 5,369,704; Claim 7 of U.S. Patent No. 6,026,395; Claim 32 of U.S. Patent No. 5,949,952; Claims 12, 13, 19 and 25 of U.S. Patent No. 6,282,510; Claim 1 of U.S. Patent No. 5,815,639; Claim 4 of U.S. Patent No. 5,926,787; and Claims 4 and 6 of U.S. Patent No. 5,970,141.

## Unfair Competition

Esquire's second counterclaim alleges that Engate's suit constituted unfair competition in violation of California Business and Professions Code § 17200 *et seq.* Esquire claims that

---

[27] Nor can we assume that the remote terminal would receive the e-mailed transcript in "real time."

Engate alleged that Esquire had infringed 131 patented claims "without a scintilla of evidence" or a "good faith belief that Engate could prevail in litigation" in hopes "that Esquire would capitulate (as did several of the defendants) to avoid having to spend millions of dollars defending itself against this baseless suit." Esquire's Mot. for Summ. J. on Unfair Competition at 1. When Esquire first filed its counterclaim, it simply alleged that "Engate has sued Esquire on patents that it knows Esquire does not and cannot infringe" and provided an example of one patent – U.S. Patent No. 5,926,787 – it was alleged to have infringed that it could not have. Esquire's Answer to Am. Compl. ¶ 13. Engate argues that Esquire's unfair competition counterclaim should be dismissed for failure to state a claim upon which relief can be granted; Esquire argues that it is entitled to summary judgment on its counterclaim.

Engate argues that the Court should read Esquire's counterclaim as alleging that Engate improperly sued Esquire for infringing only the '787 patent mentioned in Esquire's Answer. In other words, Engate argues that it should not have to defend its initial complaint alleging that Esquire infringed 131 patented claims. The Court believes Engate's suggested reading of Esquire's counterclaim is too narrow. The counterclaim cannot be read as alleging that Engate engaged in unfair competition solely by charging Esquire with violating U.S. Patent No. 5,926,787. Rather, Esquire alleged that Engate had sued Esquire on "patents" – *plural* – that it knew Engate could not have infringed and prefaced its allegation regarding the '787 patent with the phrase "[f]or example." The Court therefore rejects Engate's claim that Esquire is improperly attempting to expand its counterclaim two years after filing it. Engate makes the related argument that Esquire has failed to plead its unfair competition claim with sufficient particularity. However, the Court will not consider this argument because the Court agrees with

Engate that regardless of whether Esquire has met the necessary pleading requirements for stating a cause of action for unfair competition, the unfair competition claim is barred by an absolute privilege extended to communicative acts made in judicial proceedings, such as the filing of a complaint alleging infringement of 131 patented claims.

California Civil Code § 47 (b)(2) states that "[a] privileged publication or broadcast is one made: . . . [i]n any . . . judicial proceeding." The California Supreme Court has explained that "[t]he principal purpose of section 47[(b)] is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213, 786 P.2d 365 (1990) (citations omitted). To effectuate this purpose, § 47(b) provides absolute immunity from liability in a derivative tort action seeking redress for prior litigation-related activity – that is, it provides absolute immunity from a claim alleging that a communication or communicative conduct in an earlier proceeding constituted a tort. *Rubin v. Green*, 4 Cal. 4th 1187, 1193, 847 P.2d 1044 (1993) (footnote omitted); *Silberg*, 50 Cal. 3d at 215, 786 P.2d 365. Although § 47(b) was initially enacted to forestall defamation claims, the California courts have extended its application to all torts except malicious prosecution. *Rubin*, 4 Cal. 4th at 1194, 847 P.2d 1044 (citation omitted); *Silberg*, 50 Cal. 3d at 212, 786 P.2d 365 (citations omitted). "Malicious prosecution actions are permitted because '[t]he policy of encouraging free access to the courts . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied." *Silberg*, 50 Cal. 3d at 216, 786 P.2d 365 (quoting *Albertson v. Raboff*, 46 Cal. 2d 375, 382, 295 P.2d 405 (1956)).

Except for communicative conduct serving as the basis for a malicious prosecution claim,

"the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* at 212, 786 P.2d 365 (citations omitted). The California Supreme Court has clarified that "[t]he 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent." *Id.* at 220, 786 P.2d 365 (citations omitted). And "[a]ny doubt as to whether the privilege applies is resolved in favor of applying it." *Home Insurance Co. v. Zurich Insurance Co.*, 96 Cal. App. 4th 17, 23, 116 Cal. Rptr. 2d 583, 587 (2002) (citation omitted).

Esquire argues that the § 47(b) privilege only bars causes of action seeking redress for slanderous or libelous communications made in a court proceeding and, thus, does not apply to its counterclaim. The California Supreme Court has not construed § 47(b) so narrowly. To the contrary, in *Rubin v. Green* the California Supreme Court concluded that § 47(b) barred a lawsuit filed by the owner of a mobile home park alleging that the attorneys who sued him had engaged in solicitation by talking to potential plaintiffs and filing the suit. Much like Esquire, Rubin alleged that the defendants had tried to stir up "'frivolous litigation as a means to profit unjustly at [Rubin's] expense.'" *Rubin*, 4 Cal. 4th at 1191, 847 P.2d 1044. Rubin's suit was not based on any particular slanderous or libelous statements. Yet the court applied § 47(b), reasoning that it "c[ould] imagine few communicative acts more clearly within the scope of the privilege than those alleged in the amended complaint, that is, meeting and discussing with Cedar Village residents park conditions and the merits of the proposed failure-to-maintain lawsuit, and filing the complaint and subsequent pleadings in the litigation." *Rubin*, 4 Cal. 4th at 1195, 847 P.2d 1044. The court concluded that under § 47(b), malicious prosecution – "provided the requisite

conditions are pleaded and proven" – was the only cause of action Rubin could pursue against the lawyers for filing the allegedly frivolous case against him. *Id.* at 1200, 847 P.2d 1044.

Rubin argued that even if § 47(b) barred his solicitation claim, he should be able to maintain a claim of unfair competition against the lawyers for stirring up a baseless suit against him for their own profit. The California Supreme Court found that § 47(b) barred Rubin's unfair competition claim under the Business and Professions Code. The court reasoned that a party cannot avoid the heightened pleading requirements necessary to maintain a malicious prosecution claim by renaming the cause of action to allege a statutory offense such as unfair competition. *Id.* at 1203, 847 P.2d 1044. The court explained:

> In the typical derivative action filed in the wake of allegedly tortious litigation-related communications, the aggrieved plaintiff had been a party in the antecedent proceeding in which the challenged communications occurred, and now seeks redress for injuries alleged to have resulted from them. Unless the conditions requisite to a malicious prosecution action are pleaded and proven, section 47(b) denies relief in such circumstances, not only because that result is deemed necessary to secure the greater interest in ensuring unhindered access to the courts, but also because, as we noted in *Silberg, supra,* 50 Cal. 3d 205, the original litigation itself provides an efficient forum in which to "expos[e] during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result."

*Id.* at 1203, 847 P.2d 1044 (citing *Silberg,* 50 Cal. 3d at 214, 786 P.2d 365).

Similarly, in *Kashian v. Harriman* a state appellate court considering an unfair competition claim concluded that the filing of "meritless lawsuits on behalf of 'sham plaintiffs' to deceive the defendants into believing the suits had more support than they did in fact" was the type of communicative conduct that was covered by the §47(b) privilege. *Kashian v. Harriman,* 98 Cal. App. 4th 892, 917, 120 Cal. Rptr. 2d 576, 596 (2002) (citation omitted). Ultimately, the court found that the unfair competition claim was not barred by § 47(b), because the plaintiff

who filed the unfair competition claim had not been a party in the allegedly "meritless lawsuits" that were the basis of the unfair competition claim. *Id.* at 924, 120 Cal. Rptr. 2d at 602. However, *Rubin* and *Kashian* make clear that the § 47(b) privilege bars causes of action seeking redress for the filing of baseless lawsuits – unless the plaintiff (or counterclaimant) pleads the elements of malicious prosecution. Accordingly, the Court grants Engate's motion to dismiss Esquire's unfair competition claim under Fed. R. Civ. P. 12(b)(6).

### Conclusion

For the reasons stated above, the Court grants in part and denies in part Esquire and Atkinson-Baker's motion for partial summary judgment on invalidity [docket # 183]. The Court grants Engate's motion to dismiss Esquire's unfair competition claim [docket # 235] and denies Esquire's motion for summary judgment on its unfair competition claim [docket #247]. The Court grants Engate's motion for reconsideration [docket # 267], but denies the defendants' motion for reconsideration [docket # 266]. The Court's July 30, 2004 Memorandum Opinion and Order, reported at 2004 WL 1699024, is vacated.

_____

MATTHEW F. KENNELLY
United States District Judge

Date: August 20, 2004